## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| | ) | |
| IN RE LINERBOARD ANTITRUST | ) | MDL No. 1261 |
| LITIGATION | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| Civil Action Numbers 98-5055 and 99-1341 | ) | |
| | ) | |
| | ) | |

DUBOIS, J.                                                               JULY 16, 2012

## MEMORANDUM

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        A.      The Linerboard Class-Action Settlement and Fee Allocation; Peoples's 2004
                State Court Lawsuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        B.      All Writs Act Injunction; Settlement of Peoples–Langer Suit. . . . . . . . . . . . 7
        C.      Peoples' Telephone Messages; 2005 Emergency TRO and Consent
                Stipulation Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        D.      Peoples' Letter to Disciplinary Board; Peoples' June 29, 2006, Telephone
                Message. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        E.      Langer's First Contempt Motion; Contempt Hearing. . . . . . . . . . . . . . . . . 11
        F.      Peoples's Attempts to Relitigate Fee Allocation in State Court; Langer's
                Second Contempt Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        G.      The Court's July 14 and 15, 2008, Opinions. . . . . . . . . . . . . . . . . . . . . . . 13
        H.      Langer Seeks Reconsideration; Peoples Resumes Third State Court Suit. . . 15
        I.      Court's October 3, 2008, Memorandum & Order Granting Reconsideration
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        J.      Parties File Cross-Appeals; Peoples's Attorney Withdraws; Peoples Resumes
                Phone Harassment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        K.      Peoples's Republic First Bank Subpoenas. . . . . . . . . . . . . . . . . . . . . . . . . 19
                1.      The Subpoenas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                2.      Peoples Fails to Notify Langer of Issuance of Subpoenas. . . . . . . . . 21
                3.      Contents of the Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        L.      Third Circuit Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        M.      Peoples Instigates IRS Audit of Langer. . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                1.      Peoples Instigates Audit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                2.      IRS Audits Langer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      3.      **Langer Files Third Contempt Motion; Peoples Continues Correspondence with IRS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  N.   **Supreme Court Denies Certiorari; Third State Case Closed; Court Begins Proceedings on Remand.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  O.   **Efforts to Schedule Hearing on Pending Motions Unsuccessful.** . . . . . . . . . . 29

  P.   **Peoples Serves Notice of Motion for Sanctions; Langer Files Motion for Temporary Restraining Order.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

  Q.   **Preliminary Injunction Hearing and Related Proceedings.** . . . . . . . . . . . . . . 36

      1.      **February 3, 2012, Hearing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      2.      **Proceedings Between Hearings.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

            i.      **Peoples's Compliance with Document Production Order.** . . . . 39

            ii.     **IRS Document Production.** . . . . . . . . . . . . . . . . . . . . . . . . . . 40

            iii.    **Sanctions Filings.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

            iv.    **Langer's Memorandum Addressing IRS Communications and Setting Forth Relief Requested.** . . . . . . . . . . . . . . . . . . . . . . 42

            v.      **Peoples's Attendance at Hearing.** . . . . . . . . . . . . . . . . . . . . . 43

      3.      **February 28, 2012, Hearing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      4.      **February 29, 2012, Hearing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      5.      **Frank Marcone.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

  R.   **Langer's Requested Relief.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**III.**  **DISCUSSION—DUE PROCESS AND PEOPLES'S ATTENDANCE.** . . . . . . . . . . 50

  A.   **Due Process Required Before a Finding of Civil Contempt.** . . . . . . . . . . . . . 50

  B.   **Langer's Oral Motion to Hold Peoples in Contempt for Failure to Attend Preliminary Injunction Hearing.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**IV.**  **DISCUSSION—PEOPLES'S EIGHT ACTS OF CONTEMPT.** . . . . . . . . . . . . . . . 52

  A.   **Standard for Civil Contempt.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

  B.   **Validity of Orders.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      1.      **All Writs Act Injunction.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      2.      **2005 TRO and 2005 Consent Stipulation Order.** . . . . . . . . . . . . . . . 54

      3.      **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

  C.   **Knowledge of Orders.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

  D.   **Violations of Orders.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

      1.      **Contempt One: February 2005 Letter to Disciplinary Board.** . . . . . . . 55

      2.      **Contempt Two: June 29, 2006, Harassing Telephone Call.** . . . . . . . . 56

      3.      **Contempt Three: Filing of Second State Case on December 31, 2007** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

      4.      **Contempt Four: Filing of Third State Case on January 9, 2008.** . . . . 58

      5.      **Contempts Five through Seven: Service of Subpoenas on Republic First Bank on June 2, 2009; June 15, 2009; and September14, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

            i.      **Violation of the All Writs Act Injunction.** . . . . . . . . . . . . . . . . 59

           ii.     **The Subpoenas Were Served in Violation of Pennsylvania Rules of Civil Procedure.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**

       **6.**    **Contempt Eight: Communications with IRS Between February and October 2010.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **62**

  **E.**    **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **65**

**V.**    **REMEDIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **65**

  **A.**    **Standard—Remedies for Civil Contempt.** . . . . . . . . . . . . . . . . . . . . **65**

  **B.**    **Court's Continuing Jurisdiction.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**

  **C.**    **Permanent Injunction Regarding Financial Information.** . . . . . . . . . . . **66**

  **D.**    **Coercive Sanctions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **67**

  **E.**    **Production of All Republic First Bank Documents.** . . . . . . . . . . . . . . **69**

  **F.**    **Reinstatement of 2005 Emergency TRO and 2005 Consent Stipulation Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **73**

  **G.**    **Fees and Costs Related to Contempts.** . . . . . . . . . . . . . . . . . . . . . . . **73**

  **H.**    **Fees and Costs Related to 2012 TRO.** . . . . . . . . . . . . . . . . . . . . . . . **75**

  **I.**     **Frank Marcone.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **77**

  **J.**     **John Peoples.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **77**

**VI.**   **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**

I.       INTRODUCTION

This is a case about the tail wagging the dog.  The substance of this ground-breaking case effectively ended on March 21, 2004, when the Court granted final approval to the last two partial settlements in the class-action component of the case.  On June 2, 2004, the Court awarded a counsel fee of thirty percent of the $202,572,489 settlement, to be allocated by liaison counsel Howard Langer, Esquire.  Displeased with the allocation he received, John F. Peoples, Esquire, has engaged for almost eight years in what the Third Circuit called a "quixotic crusade" against Langer and this Court, claiming he is entitled to additional funds despite entering into a settlement agreement in 2004.  Peoples has relentlessly pursued this crusade in increasingly diverse venues and through methods that have grown more desperate at each turn.  In doing so, he has repeatedly and systematically violated court orders, stepped far beyond the bounds of ethical conduct required of attorneys, and undertaken acts that are reprehensible and possibly criminal.

Presently before the Court are Howard Langer's Motion for an Order Holding John Peoples, Esquire, in Contempt, Imposing Disciplinary Sanctions Upon Him, and Referring his Behavior to Chief Judge Bartle for an Order to Show Cause Why He Should Not Suspended From Practice and Request for Expedited Hearing; Howard Langer's Motion for an Order to Show Cause Why John Peoples Should Not Be Held in Further Contempt for Initiating a Lawsuit in Delaware County Court in Violation of this Court's All Writs Injunction; Howard Langer's Motion for an Order to Show Cause Why John Peoples Should Not Be Held in Further Contempt; Howard Langer's Motion to Proceed Without Evidentiary Hearing; Howard Langer's Motion for Preliminary Injunction; Peoples's Motion for Relief Pursuant to the Provisions of

4

Federal Rule of Civil Procedure Rule 11, Title 28 U.S.C. § 1927 and the Court's Inherent Power, and Howard Langer's Cross-Motion of Howard Langer and Langer Grogan & Diver for Sanctions under 28 USC § 1927 and the Inherent Powers of the Court.  For the reasons set forth below, the Court finds that Peoples committed civil contempt on eight occasions, imposes sanctions to compensate Langer, and orders injunctive relief with the goal of ending this dispute for good.

## II.   BACKGROUND

The relevant facts and procedural history of the Peoples–Langer dispute are set forth in detail in the prior opinions of this Court and the United States Court of Appeals for the Third Circuit.[1]  Accordingly, this Memorandum discusses only the background necessary to resolve the motions presently before the Court.  The Memorandum sets forth the facts in chronological order, notwithstanding that certain facts predating prior opinions only came to light subsequent to the issuance of those opinions.

### A.   The Linerboard Class-Action Settlement and Fee Allocation; Peoples's 2004 State Court Lawsuit

On March 21, 2004, the Court approved the last two partial settlements of the class-action component of the case, which involved "allegations that a number of U.S. manufacturers of linerboard engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."  In re Linerboard

---

[1] See In re Linerboard Antitrust Litig., MDL No. 1261, 2008 WL 2758167 (E.D. Pa. July 14, 2008) (denying motions to recuse), In re Linerboard Antitrust Litig., MDL No. 1261, 2008 WL 2758442 (E.D. Pa. July 15, 2008) (denying motion for contempt and motions to dismiss), In re Linerboard Antitrust Litig., MDL No. 1261, 2008 WL 4461914 (E.D. Pa. Oct. 3, 2008) (granting reconsideration in part of July 15, 2008, Order), In re Linerboard Antitrust Litig., 361 F. App'x 392 (3d Cir. 2010) (affirming July 15, 2008, and October 3, 2008, opinions in all aspects except Court's decision not to impose sanctions).

Antitrust Litig., 292 F. Supp. 2d 631, 634 (E.D. Pa. 2003).  The Court subsequently approved a

counsel fee of thirty percent of the total settlement amount—$202,572,489 ("Settlement

Fund")—"with allocations to specific firms to be made by liaison counsel, Howard Langer,

Esquire."  (Order of June 2, 2004, Docket no. 388); see also In re Linerboard Antitrust Litig.,

MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004).  The allocations were not included

in any filed document and never made a matter of public record.  Only Langer, as liaison

counsel, was aware of each attorney's allocation.  The allocations were kept confidential due to

"an unseemly amount of litigation between lawyers over the allocation of fees" that occurred in

class actions when the fee amounts were public.  (Feb. 3, 2012, Hr'g Tr. ("2/3/12 Tr.") 45–46.)

Republic First Bank ("RFB"), where the Settlement Fund had been deposited, made the

distributions pursuant to instructions given by Langer with the assistance of the Heffler Radetich

& Saitta LLP accounting firm ("Heffler Radetich").  (Id. at 47–48.)  The Court retained

jurisdiction "over the Settlement Fund and its distribution, as well as all issues relating to the fees

and costs of counsel in this action."  (Order of June 4, 2004, Docket no. 389); see also In re

Linerboard Antitrust Litig., MDL no. 1261, 2004 WL 1240775, at *1 (E.D. Pa. June 4, 2004).

        Langer allocated two million dollars to Peoples, who was dissatisfied with this amount

and "'made it very clear [to Langer] that [Peoples] was going to get very angry if [Langer] didn't

come up with more money.'"  In re Linerboard Antitrust Litig, 2008 WL 2758442, at *2 (quoting

May 3, 2007, Hr'g Tr. ("5/3/07 Tr.") 27).  Peoples filed suit in the Court of Common Pleas of

Philadelphia County on June 23, 2004—hereinafter the "first state case"—alleging "that he was

entitled to four million dollars in attorney's fees from the settlement of the box class-action

component of MDL 1261, as well as punitive damages and attorney's fees."[2]  Id. at *3.

Underlying Peoples's allegation was his belief that "Langer promised to pay to Peoples ten

percent (10%) of all fees awarded in MDL 1261 to Langer and all other attorneys representing

parties in the Box Sub-Class" and that Langer "misrepresented to Peoples and to [the Court] that

this overall fee was $29.4 million rather than $49 million."  In re Linerboard Antitrust Litig.,

2008 WL 4461914, at *4–5.  Langer removed the Court of Common Pleas case to this Court,

where it was docketed as Peoples v. Langer et al., Civil Action No. 04-2785.

### B.      All Writs Act Injunction; Settlement of Peoples–Langer Suit

On July 6, 2004, the Court issued an injunction pursuant to the All Writs Act, 28 U.S.C.

§ 1651 ("All Writs Act Injunction").  The injunction stated, in relevant part:

> [A]ll attorneys who participated in any way in MDL 1261 including,
> but not limited to, John F. Peoples, Esquire, and all persons acting in
> their behalf, are hereby ENJOINED from taking any further action
> relating to the allocation of fees in MDL 1261, or the action of liaison
> counsel in connection therewith, in any court or forum other than the
> United States District Court for the Eastern District of Pennsylvania.
> This Order is WITHOUT PREJUDICE to the right of John F.
> Peoples, Esquire, or any other party to seek a remand of any case
> pending in this District which concerns the allocation of counsel fees
> in MDL 1261, or the actions of liaison counsel in connection
> therewith.  The injunction is necessary to preserve the Court's
> jurisdiction over all matters relating to the award and allocation of
> counsel fees in MDL 1261.  See In re Synthroid Marketing Litigation,
> 1:97civ6017 (N.D. Ill. Aug. 22, 2003).

(Order of July 6, 2004, Docket no. 408.)

At the parties' joint request, the Court referred Civil Action No. 04-2785 to United States

Magistrate Judge Thomas J. Rueter for mediation.  Langer and Peoples reached a settlement in

which Langer agreed to pay Peoples an allocation of $2,940,000 from the Settlement Fund as

---

[2] The Linerboard case involved two classes: the box class and the sheet class.

"'the full and final settlement of Mr. Peoples' claims set forth in the Action against Mr. Langer.'"

In re Linerboard Antitrust Litig., 2008 WL 2758442, at *3 (quoting Settlement Agreement ¶ 2).

The Settlement Agreement also provided: "'Mr. Peoples specifically states that, notwithstanding

a statement he made concerning a possible disciplinary complaint against Mr. Langer, he neither

has nor knows of any ground for such a complaint.'"  Id.  Based on the settlement, the Court

dismissed Civil Action No. 04-2785 with prejudice on November 16, 2004, pursuant to Local

Rule of Civil Procedure 41.1(b).

C.      **Peoples' Telephone Messages; 2005 Emergency TRO and Consent Stipulation Order**

Between July 17, 2004, and March 17, 2005, Peoples left ten harassing telephone

messages on Langer's voicemail.  In re Linerboard Antitrust Litig., 2008 WL 2758442, at *4

(listing contents of the ten messages).  Peoples later admitted that he left the voicemails, but he

claimed that they were not threatening and that he left them because he was angry and "'not

happy about the settlement [in Peoples v. Langer et al., Civil Action no. 04-2785].'"  Id. (quoting

5/3/07 Tr. 94).  Langer filed a motion for a temporary restraining order to stop the harassing

telephone calls on March 21, 2005; on March 22, 2005, by agreement of the parties, the Court

issued an Emergency Temporary Restraining Order ("2005 Emergency TRO").[3]  The Emergency

Temporary Restraining Order stated, in relevant part:

_____

        [3] At Peoples's request, the 2005 Emergency TRO and the 2005 Consent Stipulation Order, discussed infra, were not filed when issued "to protect Peoples" because his counsel "was concerned that . . . [the orders] could have been used in disciplinary proceedings and could harm Peoples's legal practice."  In re Linerboard Antitrust Litig., 2008 WL 2758442, at *5.  The Court ordered the 2005 Emergency TRO and the 2005 Consent Stipulation Order filed in its Memorandum and Opinion dated July 15, 2008, but they were not entered on the docket until February 3, 2012, as docket numbers 1112 (2005 Emergency TRO) and 1113 (2005 Consent Stipulation Order).

1. John F. Peoples is HEREBY ENJOINED from having any contact or other communication, or leaving any messages for Liaison counsel, Howard Langer, and,

2. John F. Peoples is HEREBY ENJOINED from making any defamatory statements regarding Howard Langer, and from undertaking any other action of any kind, directly or indirectly, having the intended or the necessary effect of harming Howard Langer or his family in any fashion.

IT IS FURTHER ORDERED that this Temporary Restraining Order . . . shall, by agreement of the parties, remain in effect until further order of the Court but shall not be filed of record unless there is a reported violation of the Temporary Restraining Order . . . .

IT IS FURTHER ORDERED that this Temporary Restraining Order shall be held in STRICT CONFIDENCE by the parties to this proceeding and their attorneys, and shall NOT BE DISCLOSED to any other party without prior Court approval.

(2005 Emergency TRO, Docket no. 1112.)

The parties later agreed to entry of a Consent Stipulation Order ("2005 Consent Stipulation Order"), which the Court issued on September 8, 2005. That order stated, in relevant part:

The Order dated March 22, 2005 shall by agreement of the parties remain in effect on the following conditions:

IT IS ORDERED that said Order shall remain in effect until such time as the Court is satisfied that there is no longer a need for it, but shall not be filed of record unless there is a reported violation of that Order.

IT IS FURTHER ORDERED that this Court retains jurisdiction to enforce the terms of this Consent Stipulation Order and the Temporary Restraining Order;

IT IS FURTHER ORDERED that this Consent Order shall be held in STRICT CONFIDENCE by the parties to this proceeding and their attorneys, and SHALL NOT BE DISCLOSED to any other person

9

without prior Court approval.

It having been represented to the Court by John F. Peoples' counsel that John F. Peoples has discussed this form of Order with him and that John F. Peoples consents to the issuance of this Order to the parties and that the Order shall be issued but not entered, IT IS FURTHER ORDERED that John F. Peoples waives any right to contest the issuance of this Order and the right to contest its effect because it has been issued but not entered.

(2005 Consent Stipulation Order, Docket no. 1113.)

The 2005 Emergency TRO or 2005 Consent Stipulation Order were not filed at the time of their issuance because "Peoples' attorney was concerned that, if recorded, [the orders] could have been used in disciplinary proceedings and could [have] harm[ed] Peoples' legal practice." In re Linerboard Antitrust Litig., 2008 WL 2758442, at *5.

### D.    Peoples' Letter to Disciplinary Board; Peoples' June 29, 2006, Telephone Message

On October 19, 2005, Peoples wrote a letter to the Disciplinary Board of the Supreme Court of Pennsylvania and "'lodge[d] a formal complaint against Howard Langer, Esquire . . . in connection with his refusal to honor his contractual responsibility to pay [Peoples] a co-counsel fee of approximately 4.7 million dollars.'" In re Linerboard Antitrust Litig., 2008 WL 2758442, at *5 (quoting Lead Counsel's Mem. on Potential Disciplinary Violations, Ex. B at 1).

Although the 2005 Emergency TRO remained in effect by virtue of the 2005 Consent Stipulation Order, Peoples left a telephone message on Langer's voicemail on June 29, 2006, stating "I didn't forget you." Id. at *6 (citation omitted).  Peoples later testified that he left the message because he thought about his $2.9 million settlement with Langer "almost every night" and "bubble[d] over with anger." Id. (citing 5/3/07 Tr. 47).

10

### E.     Langer's First Contempt Motion; Contempt Hearing

Langer notified the Court of the June 29, 2006, voicemail the same day, and on July 5, 2006, he filed a Motion for an Order Holding John Peoples in Contempt ("First Contempt Motion"), in which he argued that the voicemail constituted contempt of the 2005 Emergency TRO and 2005 Consent Stipulation Order and that a coercive civil contempt remedy and permanent injunctive relief were warranted.  In re Linerboard Antitrust Litig., 2008 WL 2758442, at *6.  The parties' attempts to resolve the issues were unsuccessful, and the Court held hearings on the First Contempt Motion on March 16, May 3, and May 4, 2007.  During the hearings, "Peoples and his attorney, Frank Marcone ("Marcone"), frequently attempted to inject into the contempt hearing the issue of Peoples' contribution to the class action component of MDL No. 1261."  Id. at *6 (citation omitted).  The Court viewed the efforts of Peoples and Marcone as nothing more than improper attempts to relitigate the fee allocation issue.  Id.  During the hearings, Peoples alleged for the first time that Langer and the Court had an improper relationship—specifically, he claimed that "Langer and other individuals led [Peoples] to believe that Langer had an improper relationship with the Court in order to persuade him to settle [Peoples's] fee dispute."  Id. at *7.  During the hearings, several witnesses testified that these allegations were unfounded.  Id.

### F.     Peoples's Attempts to Relitigate Fee Allocation in State Court; Langer's Second Contempt Motion

On December 31, 2007, in the Delaware County Court of Common Pleas, Peoples filed a Complaint against Langer and other attorneys who had been involved in this case—docketed as Peoples v. Langer, Civil Action No. 07-18531 ("second state case")—in which he reiterated his

contention that he "was entitled to ten percent of the Box Class counsel fee."  In re Linerboard Antitrust Litig., 2008 WL 4461914, at *2.  On January 24, 2008, before the Complaint was served, Peoples filed a praecipe to dismiss the second state case without prejudice, and Langer did not learn of the Complaint in the second state case until September 8, 2008.  Id.  On January 9, 2008, Peoples filed a praecipe for a writ of summons in the Delaware County Court of Common Pleas; the writ of summons was issued as Civil Action Number 08-1322 on February 1, 2008, and was served on Langer on February 21, 2008 ("third state case").  Id. at *3.

Peoples served Langer with interrogatories relating to the allocation of fees in Linerboard on January 23, 2008; he filed a motion to compel answers on March 12, 2008.  The interrogatories and motion purported to be related to the removed federal case, Civil Action No. 04-2785, which had been closed in 2004.[4]  Id.  On March 20, 2008, Langer filed Liaison Counsel's Motion for an Order to Show Cause Why John Peoples and the  Law Office of John Peoples Should not Be Held in Further Contempt for Initiating a Lawsuit in Delaware County Court in Violation of this Court's All Writs Act Injunction ("Second Contempt Motion").  In the Second Contempt Motion, Langer argued, inter alia, that Peoples violated the All Writs Act Injunction by filing the third state case.  While the Second Contempt Motion was pending, Peoples filed two recusal motions and renewed his allegations that "Langer has sought 'refuge'

---

[4] To justify his erratic filings across both federal court docket numbers and his motion seeking mandamus from the Third Circuit, Peoples has repeatedly advanced the meritless theory that the Court wrongly injected itself "in a contract action between Peoples and Langer" unrelated to Linerboard and that the Court had "no jurisdictional nexus" over the Peoples–Langer dispute. (E.g., Peoples's Mot. Dismiss Any Reference TRO Which Was Entered Improperly After Case Was Dismissed With Prejudice, E.D. Pa. Civil Action No. 04-2785, Docket no. 54, at 5.)  The Third Circuit dismissed Peoples's mandamus action without a published opinion on October 16, 2007, and denied his petition for rehearing en banc.  In re Peoples et al., No. 07-3586 (3d Cir.).

under [the Court's] protection [to] illegally thwart Peoples['s] right to sue for over six million dollars as his part of the fee earned by Langer."  (Peoples's Supplemental Motion to Recuse, E.D. Pa. Civil Action No. 04-2785, Docket no. 69, at 3; see also Peoples's Motion to Recuse, E.D. Pa. Civil Action No. 04-2785, Docket no. 68.)

> G.     The Court's July 14 and 15, 2008, Opinions

The Court denied Peoples' Motion to Recuse and Supplemental Motion to Recuse by Memorandum and Order dated July 14, 2008. In re Linerboard Antitrust Litig., 2008 WL 2758167, at *11–12 (emphasizing that the Court "played only a peripheral role in the resolution of Peoples's case against Langer," which was handled by Magistrate Judge Rueter, and that "[t]he Court had absolutely no relationship whatsoever with Langer other than that arising from the approval of his designation as liaison counsel in the In re Linerboard Antitrust Litigation").

The Court issued an additional Memorandum and Order the next day that addressed the first two contempt motions.  The Court ruled on three threshold issues in the Memorandum. First, it rejected Peoples's argument that the Court lacked jurisdiction to hold him in contempt and affirmed that its issuance of the All Writs Act Injunction was proper.  In re Linerboard Antitrust Litig., 2008 WL 2758442, at *7–10 (quoting Grider v. Keystone Health Plan Cent., Inc., 500 F.3d 322, 329 (3d Cir. 2007)).  Second, noting that "[t]he purpose of the [2005 Emergency TRO and the 2005 Consent Stipulation Order] was to prevent Peoples from interfering with Langer's fee allocations in MDL No. 1261 in any way," the Court concluded that it had jurisdiction to enter those two orders.  Id. at *10–11.  Finally, the Court affirmed that it had properly exercised jurisdiction over the Peoples v. Langer case removed from the Philadelphia County Court of Common Pleas.  Id. at *11–12.

The Court then determined that Peoples had committed contempt on two occasions.
First, Peoples violated the 2005 Emergency TRO and 2005 Consent Stipulation Order by leaving
a voicemail for Langer on June 29, 2006.  Id. at *14.  Second, Peoples violated the All Writs Act
Injunction when he sent a complaint to the Disciplinary Board of the Supreme Court of
Pennsylvania regarding Langer on October 19, 2005.  Id. at *16.

Although it found that Peoples had committed contempt on two separate occasions, the
Court declined to sanction Peoples.[5]  The Court gave three reasons for its ruling: (1) Peoples's
"severe physical afflictions," including blindness and a history of diabetes, strokes, high blood
pressure, pneumonia, and prostrate issues; (2) the Court's belief—later learned to be
mistaken—that Peoples had not violated the 2005 Emergency TRO and 2005 Consent Stipulation
Order after June 29, 2006; and (3) the fact that "a prospective fine would be unenforceable"
because "the Court's jurisdiction over [the Peoples–Langer] dispute [would] end upon
termination of the class action component of MDL No. 1261 by order and memorandum to be
issued upon receipt of a supplement to the Final Report of the Claims Administrator."  Id. at
*16–17.

Based on its conclusion that contempt sanctions were not warranted, the Court denied the
First Contempt Motion.  The Court also denied the Second Contempt Motion without reaching
the issue it presented—whether Peoples again violated the All Writs Act Injunction by filing the
third state case.  Id. at *19.  In addition, relying on the conclusion that its jurisdiction over the
Peoples–Langer dispute would end when the Claims Administrator submitted a supplement to

---

[5] The Court also concluded that imposing disciplinary sanctions and referring Peoples's
behavior to then-Chief Judge Bartle were not appropriate on the record presented.  In re
Linerboard Antitrust Litig., 2008 WL 2758442, at *17–18.

the Final Report, the Court vacated the 2005 Emergency TRO, the 2005 Consent Stipulation

Order, and the All Writs Act Injunction.  Id. at *17, 19.

### H.    Langer Seeks Reconsideration; Peoples Resumes Third State Court Suit

Langer filed a motion for reconsideration on July 21, 2008, in which he sought

reinstatement of the All Writs Act Injunction and a permanent injunction against Peoples that

would bar him from taking further action in state court regarding the fee allocation dispute.  In

the alternative, Langer sought a stay of dissolution of the All Writs Act Injunction pending an

appeal.[6]

In a July 24, 2008, interview with The Legal Intelligencer, Peoples "vowed to continue

his court battles with Langer," reiterating the previously rejected claim that this Court had no

jurisdiction over a referral fee dispute.  ("Federal Judge Calls Halt to Ugly Fee Dispute," The

Legal Intelligencer, Mot Proceed Without Evidentiary Hearing & Require Peoples Submit Doc.

Decl. Ct. & Langer's Csl. ("Motion to Proceed Without Hearing") Ex. 11, at 1–3.)  Peoples made

good on this promise: through counsel Stephen Palmer, Esquire, he served interrogatories on

Langer in the third state case on September 3, 2008.  (Interrogs. Addressed Def. Howard Langer,

Esquire & Def. Langer & Grogan, PC Aid Preparation Compl. Pursuant Pa. R. Civ. Proc. 4005,

Mot. Proceed Without Hr'g Ex. 12.)  Shortly after receiving the interrogatories in the third state

case, Langer learned of the existence of the second state case.  In re Linerboard Antitrust Litig.,

2008 WL 4461914, at *5.

---

[6] Langer filed a Notice of Appeal as to the July 15, 2008, Memorandum & Order on
August 14, 2008.

I.      **Court's October 3, 2008, Memorandum & Order Granting Reconsideration**

The Court granted Langer's motion for reconsideration on October 3, 2008,[7] citing three

newly  discovered pieces of evidence: (1) the article in The Legal Intelligencer; (2) the discovery

served on Langer in the third state court case; and (3) the existence of the second state court case.

Id. at *4–5.  The Court again rejected Peoples's contention that it lacked jurisdiction over him

and the Peoples–Langer dispute.  Id. at *5.  Correcting a misstatement in its July 15, 2008,

Memorandum, the Court concluded that it had authority to issue and enforce an All Writs Act

Injunction even after the class-action component of MDL No. 1261 terminated.  Id. at *6–7

(citing, inter alia, In re Prudential Ins. Co. Am. Sales Practice Litig., 261 F.3d 355 (3d Cir.

2001)).  The Court further held that reinstatement of the All Writs Act Injunction was necessary

in light of Peoples's continued efforts to upset the counsel fee allocation through state-court

litigation.  Id. at *8–9 (discussing how ""Peoples [had] made it clear that he intend[ed] to

relitigate the fee dispute in state court if not enjoined from doing so").

The October 3, 2008, Memorandum & Order addressed two other issues that Langer

asked the Court to reconsider.  First, notwithstanding that Peoples had allegedly left a telephone

message for Langer on September 16, 2008, the Court declined to reinstate the 2005 Emergency

TRO and 2005 Consent Stipulation Order, instead recommending that Langer report the message

to the police if he believed it to be threatening and illegal.  Id. at *9.  Second, the Court again

declined to refer Peoples for disciplinary action.  Id.

---

[7] Also on October 3, 2008, the Court approved the Final Report on Claims
Administration.  In re Linerboard Antitrust Litig., MDL No. 1261, 2008 WL 45426689, at *1–2
(E.D. Pa. Oct. 3, 2008).  The approving Memorandum & Order provided that the Court retained
continuing jurisdiction over the settlement agreements in the case.  Id.

**J.      Parties File Cross-Appeals; Peoples's Attorney Withdraws; Peoples Resumes Phone Harassment**

After the Court issued its October 3, 2008, Memorandum & Order, the parties filed cross-appeals.  Langer challenged both the July 15, 2008, and October 3, 2008, opinions, while Peoples, represented by his associate Stephen Cristal, Esquire, appealed only the latter.  In re Linerboard Antitrust Litig., 361 F. App'x at 393.  The parties' appeals were consolidated in the Third Circuit, where the briefing on appeal took place between February 20, 2009, and June 17, 2009.  In re Linerboard Antitrust Litig., Nos. 08-3493, 08-4453, 08-4524 (3d Cir.).

After learning of the Court's October 3, 2008, Memorandum & Order, Palmer, who was representing Peoples in the third state case, wrote a letter dated October 7, 2008, addressed to Peoples and Peoples's paralegal, Sharon Pompilii.[8]  In that letter—of which the Court and Langer were not aware until the 2012 Preliminary Injunction hearings—Palmer advised Peoples as follows [9]:

> [M]y reading of the October 2, 2008 Order leads me to once again believe that any action in Delaware County is now enjoined.

---

[8] Pompilii testified that she began working for Peoples's firm, Law Offices–John F. Peoples, on December 14, 2006.  (Feb. 28, 2012, Hr'g Tr. ("2/28/12 Tr.") 64.)  She worked full time for Peoples until his office closed on October 1, 2011.  (Id. at 65.)  Peoples, who is blind, did not employ a secretary, so his firm's staff consisted of attorney Steven Cristal, Esquire; Pompilii; and himself.  (E.g., id. at 70.)  Pompilii's duties were "[c]ollections . . . pre- or post-judgment actions, filing claims, [and] sending letters," as well as monitoring Peoples's "johnfpeoples@yahoo.com" e-mail account.  (Id. at 43, 64.)

Pompilii still works on "personal things" and "some cases that are ongoing" for about ten hours of work a week.  (Id. at 65.)  Due to Peoples's physical and mental health issues, Pompilii sometimes assists Peoples when he is experiencing depression. (Id. at 126–27; see also id. at 129 ("Q: Does John have any friends that he seeks friendly advice from? A: I would, I mean, he speaks to Frank [Marcone], he speaks to me, he has his drivers.").)

[9] Pompilii testified that she did not recall receiving this letter.  (2/28/12 Tr. 82–84.)

17

> Under the circumstances, I cannot and will not risk contempt of the Judge's reinstatement of the injunction by proceeding further in Delaware County.  I would be happy to do so <u>once the way is clear</u>. Perhaps, the Judge will vacate the injunction again, or perhaps the Third Circuit will reverse his actions.
>
> I do know that you feel much differently about this than I and are considering proceeding in Delaware County in the face of the injunction.  I strongly urge you not to take that action since I believe that it will expose you to contempt sanctions . . . .
>
> In view of the current situation, I believe that I have no alternative but to withdraw my appearance, as we discussed by telephone on October 2, 2008, leaving the decision as to whether to prosecute or not prosecute the Delaware County action solely in the hands of your office.

(Oct. 7, 2008, Letter from Stephen Palmer, Esq., to John F. Peoples, Langer Ex. 48, 2-3.[10])  The

docket entries for the third state case confirm that Palmer withdrew his appearance on October 7,

2008.  (Civil Case Docket No. 08-1322, Langer Ex. 20.)

       Langer testified that, at some point after the Court issued the October 3, 2008,

Memorandum and Order, Peoples resumed making harassing telephone calls, which

"crescendoed to the point that they were occurring every half hour."  (2/3/12 Tr. 65–67.)  Langer

"went to the District Attorney's Office," which "had a policeman speak to Mr. Cristal, [who]

advised [Cristal that] if there was one more call they would have someone out there to arrest Mr.

Peoples."  (<u>Id.</u>)  According to Langer, the calls stopped after the police officer spoke to Cristal.

(<u>Id.</u>)  Langer did not provide specific dates for these telephone calls, but he testified that Peoples

left a final message—in which Peoples "screamed . . . 'I want my money, I want my

money'"—"[a]bout a year, year and a half" before the February 3, 2012, hearing.  (<u>Id.</u> at 66.)

---

[10] Except where noted, all references to "Langer Exhibits" are to the exhibits introduced at the Preliminary Injunction Hearings in February 2012.

### K.    Peoples's Republic First Bank Subpoenas

#### 1.    The Subpoenas

Langer—and likewise the Court—did not learn the extent of Peoples's efforts to pursue the third state case until February 2012.  Through the circumstances surrounding Langer's January 31, 2012, Motion for Temporary Restraining Order, discussed infra, it became apparent that, between June 2, 2009, and September 2009, Peoples served three subpoenas on Republic First Bank ("RFB"), which managed the bank accounts for Linerboard.

Peoples' first subpoena was sent with a cover letter dated June 2, 2009.  (June 2, 2009, Letter and Subpoena from John F. Peoples, Langer Ex. 22.) The first subpoena and cover letter were captioned with Delaware County Civil Action No. 2008-1322.  The first subpoena purported to require RFB's Records Custodian to attend a deposition at Peoples's law office on June 26, 2009, and bring "[a]ll records of all transactions, deposits, withdrawals, transfers, debits, credits, checks, etc. for Account of 'Linerboard Antitrust litigation' . . . set up by Howard Langer, Esq. or another, from 1/1/03–12/31/08."  (Id. at 2.)  Peoples then sent RFB a second cover letter and subpoena on June 15, 2009, again referencing Delaware County Civil Action No. 2008-1322.  (June 15, 2009, Letter and Subpoena from John F. Peoples, Langer Ex. 22.)  The June 15, 2009, cover letter states: "As for the prior Subpoena sent to you cover of letter dated 6-2-09, Plaintiff withdraws it and you may disregard it.  Instead, please respond to the enclosed Subpoena."  (Id. at 1.)  The June 15, 2009, Subpoena seeks the deposition of RFB's Record Custodian and required production of "[a]ll records of all transactions, deposits, withdrawals, transfers, checks, debits, credits, etc. for account of Linerboard Litigation Fund for period 1-1-03 to 12-31-08."  (Id. at 2.)

On July 31, 2009, RFB produced to Peoples complete account records for three Linerboard accounts and a partial record for a fourth account.  (July 31, 2009, Letter from Maria Murphy to Law Offices – John F. Peoples, Langer Ex. 22.)  RFB informed Peoples by letter that the records for the fourth account were not finished but would be sent when completed.  (Id.)  Peoples responded by letter dated August 11, 2009, with a "request" for RFB "to provide after-hours assistance to complete the response to [his] Subpoena."  (August 11, 2009, Letter from John F. Peoples to Maria Murphy, Langer Ex. 22.)  Peoples wrote that he was willing to pay "whatever additional fee [was] necessary" for the after-hours work and that he was "most interested in the period 6/9/04 to 6/30/04."  (Id.)

RFB provided the completed documentation to Peoples on August 31, 2009.  (Aug. 31, 2009, Letter from Maria Murphy to Law Offices – John F. Peoples, Langer Ex. 22.[11])  On September 14, 2009, Peoples sent a third cover letter and subpoena to RFB.  He wrote: "Your response to my Subpoena revealed additional bank accounts."  (Sept. 14, 2009, Letter from John F. Peoples to RFB, Langer Ex. 22.)  The cover letter and subpoena again referenced Delaware County Civil Action No. 08-1322.  (Id.)  The subpoena, captioned "Subpoena to Produce Documents or Things For Discovery Pursuant to Rule 4009.22," purported to require RFB to produce documents for several accounts that are identified by number only.  (Id.)

On September 30, 2009, Peoples wrote a letter to "Bob Welsh" at RFB.  (Sept. 30, 2009, Letter from John F. Peoples, Esquire, to RFB, Langer Ex. 22.)  The letter states, in relevant part:

---

[11] Although the letter is dated July 31, 2009, the Court concludes that it was sent on August 31, 2009; the photocopied version of the letter introduced in evidence has a Post-It note stating "remainder of Linerboard Subpoena received today 8/31/09 from Republic First Bank," and the letter could not have been sent before Peoples's August 11, 2009, letter.  (See id.)

Please allow me to explain what we are hoping to find.

First, who was paid from the Linerboard settlement. The information you supplied provided that information. Thank you.

Second, how much was received in the settlement. Only one deposit is directly from a defendant. The rest of the money in the checking accounts came from the sale of securities. Several deposit slips [account number]. We are looking to find the information on that account, mainly the initial deposit, if possible.

Thank you for your anticipated cooperation in this matter. Please do not hesitate to call me, my Associate Steve Cristal or paralegal Sharon Pompilii if you have any further questions.

(Id.)

Peoples wrote an additional letter to RFB dated October 30, 2009, authorizing "Frank Conroy" to "pick up the records for the above referenced case," the third state case. (Oct. 30, 2009, Letter from John F. Peoples to RFB, Langer Ex. 22.) Pompilii testified that she signed this letter. (2/28/12 Tr. 90.)

Pompilii and Cristal analyzed the documents—hereinafter "RFB financial records"—received in response to his subpoena and prepared ledgers and spreadsheets for Peoples summarizing the information contained in the documents. (Id. at 70, 81, 98–99.)

## 2.    Peoples Fails to Notify Langer of Issuance of Subpoenas

Peoples did not give Langer notice of the three subpoenas that Peoples served on RFB despite the fact that Pennsylvania Rule of Civil Procedure 4009.21(a) requires that "[a] party seeking production from a person not a party to the action shall give written notice to every other party of the intent to serve a subpoena at least twenty days before the date of service." (See 2/3/12 Tr. 53–54 (testimony of Langer: "[U]ntil this morning [February 3, 2012] when the bank

produced this I had no idea this subpoena had been served.").)  The third state case docket entries

do not reflect that Peoples filed certification that he had notified Langer of service of the

subpoenas as required by Pennsylvania Rule of Civil Procedure 4009.22(a).  (Civil Case Docket

No. 08-1322 at 1.)  The docket entries likewise do not disclose that the state court resolved any

dispute between Peoples and Langer as to the subpoenas.  (Id.)  Indeed, the only docket entry

after Palmer withdrew his appearance is the case's termination in October 2010.  (Id.)

### 3.    Contents of the Records

The documents that RFB turned over to Peoples in response to his subpoenas were filed

under seal as Langer Exhibit 22 due to the confidential financial information they contain.

Robert Opferman, RFB's director of security, authenticated Langer Exhibit 22 as containing the

records RFB produced to Peoples in response to the subpoenas.  (2/3/12 Tr. 37–38.)

Generally, the records are an amalgam of account statements, trade tickets, ledger entries,

wire transfer records, checks, and other miscellaneous documents, many of which have

handwritten notations on them.  Among the documents are transfer records revealing the amounts

paid as counsel fees to law firms in 2004 as part of the In re Linerboard Antitrust Litigation

settlement, including the amount that LaRocca's firm received.

### L.    Third Circuit Opinion

The Third Circuit issued a nonprecedential opinion in this case on January 14, 2010.  The

opinion first held that the All Writs Act Injunction was proper when first entered under both the

"in aid of jurisdiction" and relitigation exceptions to the Anti-Injunction Act.  In re Linerboard

Antitrust Litig., 361 F. App'x at 396.  The appellate court also upheld the reinstatement of the

All Writs Act Injunction on October 3, 2008.  Id. at 397.

The Third Circuit next concluded that the Court acted within its discretion in declining to reinstate the 2005 Emergency TRO and 2005 Consent Stipulation Order.  It emphasized that, at the time of the decision, "the harassing phone calls had substantially diminished, the Linerboard counsel fee allocation was complete, and any remaining dispute between Langer and Peoples was primarily of a personal nature."  Id. at 398.

The appellate court then turned to Langer's argument that this Court improperly refused to impose sanctions on Peoples after finding that Peoples had violated the All Writs Act Injunction and the 2005 Emergency TRO and 2005 Consent Stipulation Order.  The Third Circuit determined that, in declining to impose sanctions on Peoples in July 2008, this Court had mistakenly relied on the understanding—corrected in the October 3, 2008, Memorandum—that it would lose jurisdiction over the case when the class-action component of the case terminated.  Id. at 399.  Accordingly, the Third Circuit "vacate[d] that portion of [the July 15, 2008 Memorandum and Order] denying Langer's request for civil contempt sanctions" and "remand[ed] for reconsideration of Langer's requests for attorneys fees in connection with past violations."  Id.

Lastly, the Third Circuit addressed the allegations of judicial misconduct Peoples levied at this Court.  Finding Peoples's claims "spurious" and "baseless," the appellate court stated:

> [B]oth Peoples and his counsel have continued their quixotic crusade on appeal by including unsupported charges and innuendo in the brief filed in this Court. . . . Whether borne out of desperation or ethical lapses, we do not take lightly Peoples's attempts to sully the reputation of a Judge of the United States who has, after over twenty years of distinguished service, earned a reputation for honesty and fairness.  Such accusations, even when unfounded as they are here, can undermine the coin of the realm of the judiciary: equal justice under the law and the public's faith therein.

Id. at 400–01 (citations omitted).

Peoples filed a petition for certiorari with the United States Supreme Court on April 30, 2010, which the Supreme Court denied.  Peoples v. Langer, 131 S. Ct. 84 (Oct. 4, 2010).

On February 18, 2010, the Court ordered the parties to brief the issues to be covered on remand.  Langer filed a Memorandum "seeking compensatory and coercive civil contempt sanctions against Peoples, in the form of attorney[s'] fees and a per diem fine"; Peoples "filed a response . . . objecting to the imposition of sanctions and requesting both discovery and a hearing."  In re Linerboard Antitrust Litig., MDL No. 1261, 2010 WL 3928638, at *3 (E.D. Pa. Oct. 5, 2010).  Peoples also "served written interrogatories on Langer, relating to the amount of attorney[s'] fees alleged in Langer's Memorandum, [and] Langer promptly filed objections to the interrogatories."  Id.  The Court decided to await resolution of Peoples's pending petition for certiorari before resolving the issues on remand.

### M.    Peoples Instigates IRS Audit of Langer

Between March and December 2010, Peoples corresponded with the Internal Revenue Service ("IRS"), purporting to be a whistleblower identifying underreporting of income by Langer.[12]  The Court did not learn that Peoples had done so until the February 2012 hearings.

---

[12] These facts were established in part by documentary evidence that was in the possession of Peoples and the IRS.  The process by which Langer and the Court came to learn of these documents is discussed infra.  The documents in Peoples's possession were introduced into evidence as Langer Exhibit 31, and the IRS documents were introduced as Langer Exhibits 46 and 47; all three exhibits were placed under seal during the hearing on February 28, 2012.

### 1.    Peoples Instigates Audit

On March 9, 2010, Walter Timby, Esquire, of the law firm of Gibson & Perkins, P.C., filed with the IRS on Peoples's behalf an Application for Award for Original Information ("IRS Form 211") dated March 8, 2010, that Timby had helped Peoples prepare.  (See IRS Form 211, Langer Ex. 46, at IRS267–68; March 9, 2010, Letter from Walter Timby, Esq., to IRS, Langer Ex. 46, at IRS270; see also 2/28/12 Tr. 16–17.)  As part of this preparation process, in February 2010, Peoples provided Timby with 824 pages of RFB's records of the Linerboard accounts. (See Documents in Possession of Gibson & Perkins, Langer Ex. 33; see also 2/28/12 Tr. 19.) Timby's involvement with Peoples's IRS filing ended when Timby submitted the form.  (2/28/12 Tr. 17 (testimony of Timby that "[W]e did not do anything once we mailed it in.").)

The IRS Form 211 alleged that Langer "claimed to other parties, as well as in civil pleadings," that he received an amount less than he actually received from the settlement in In re Linerboard Antitrust Litigation.  (IRS Form 211 at IRS267.)  The form contains an attachment that states, inter alia: "I have attached copies of the treasury accounts and disbursement accounts as support for my position . . . ."[13]  (Id. at IRS268.)  The IRS Form 211 is stamped "Internal Revenue Service - Mar 16 2010 - Whistleblower Office."  (Id. at IRS267.)  On March 19, 2010, the IRS sent Peoples a letter stating that it had received the form and assigned it a claim number and an analyst, Cindy Stuart.  (March 19, 2010, Letter from Simone Newman to John Peoples, Langer Ex. 47, at IRS311.)

---

[13] Remarkably, among the documents in the IRS's possession was the first page of Stephen Palmer's October 7, 2008, letter to Peoples, in which he warned Peoples that proceeding with the third state case was enjoined by the reinstatement of the All Writs Act Injunction. (Langer Ex. 46 at IRS200.)

On July 2, 2010, Peoples sent Stuart an e-mail with an attached letter dated July 1, 2010, providing "additional information pursuant to [a] telephone call."[14]  (July 2, 2010, E-mail and Letter, Langer Ex. 31, at 4–5.)  Aside from Peoples's allegations about money he believed Langer had hidden, the letter repeated the same allegations about judicial misconduct.  (Id.) Peoples did not advise the IRS that the Third Circuit had rejected these allegations as spurious. (Id.)  The letter also stated: "Langer had unprecedented influence with Judge DuBois.  It took the author 5 ½ years to obtain bank account information and I did so at the risk that Judge DuBois would find out and hold me in contempt."  (Id. at 5.)

### 2.    IRS Audits Langer

During the fall of 2010, Langer and his wife received an audit letter from the IRS. (2/3/12 Tr. 49.)  Langer and his wife were required to attend an appointment at the IRS office in Philadelphia on October 6, 2010, for an examination of their 2004 tax return.  (Id.; see also Confirmation & Information Document Request, Langer Ex. 7.)  The IRS sent Langer and his wife a request to bring to the appointment certain documents and answers to questions. (Confirmation & Information Document Request 3.)  As part of its request, the IRS sought "a brief history of [Langer's] part in the Linerboard class action suit," "to whom and how much was distributed to each attorney," and "all the tax returns where the Linerboard case settlement funds were reported." (Id.)

Langer contacted the Heffler Radetich accounting firm, which had helped administer the distributions in Linerboard, for assistance in responding to the IRS audit.  (2/3/12 Tr. 50–51; see also Decl. Edward Radetich ("Radetich Decl."), Langer Ex. 8.)  During the appointment with the

---

[14] Pompilii testified that Peoples dictated this letter and she typed it.  (2/28/12 Tr. 113.)

IRS, one of the auditors made a "comment" to Langer to the effect that "they wanted to see what Mr. Peoples's distribution was." (2/3/12 Tr. 50.) Heffler Radetich Senior Partner Edward Radetich was present at the audit, and the IRS agents also discussed the distribution to Peoples with him. (Radetich Decl. ¶¶ 10–11.) The IRS did not take any action against Langer and closed the case with a determination that "no change" was required in Langer's tax returns. (Id. ¶¶ 12–14; 2/3/12 Tr. 51.) Radetich opined that, based on his extensive experience with audits, the audit was "unusual" and that he "suspected that someone had told the IRS that it should look into the reporting of income by firms that received Linerboard fees." (Radetich Decl. ¶ 15(d).)

Between September 23, 2010, and October 27, 2010, Langer incurred $5,575.00 in fees at Heffler Radetich for their assistance in responding to the audit, which required thirty-seven hours of work. (Heffler Radetich Invoice, Langer Ex. 39.)

### 3. Langer Files Third Contempt Motion; Peoples Continues Correspondence with IRS

After receiving notice that the IRS found no evidence of impropriety, Langer filed his Motion to Show Cause Why John Peoples Should Not Be Held in Further Contempt of Court on October 28, 2010 ("Third Contempt Motion"), arguing that Peoples violated the All Writs Act Injunction by instigating the IRS audit.

Pompilii, via Peoples's Yahoo e-mail address, sent Stuart a copy of the third contempt motion on November 9, 2010. (Nov. 9, 2010, E-mail from Sharon Pompilii to Cindy Stuart, Langer Ex. 31, at 9–29.) At Peoples's instruction, Pompilii sent Stuart an additional e-mail on November 15, 2010, stating: "Since it is such a complicated case, here is an explanation. I have attached a 4 page (Statement of Facts) synopsis and, if you need further details, the full 24 page

27

explanation." (Nov. 15, 2010, E-mail from John F. Peoples to Cindy Stuart and Attachments

("11/15/10 E-mail and Attachments"), Langer Ex. 31, at 30–58; 2/28/12 Tr. 116–19.)  The

attachments elaborate on Peoples's allegations of an improper relationship between the Court and

Langer and his assertions that "there was no federal jurisdiction over John F. Peoples."[15]  (E.g.,

Nov. 15, 2010, E-mail and Attachments, at 5.)  According to Pompilii, because the attachments

reference dates in October 2007, Cristal must have drafted them.  (2/28/12 Tr. 117–18.)  The

attachments contain language to the effect that Cristal drafted them as part of a complaint

presented to the Judicial Council of the Third Circuit on October 29, 2008.  (See 11/15/10 E-mail

and Attachments 58.)

Peoples, by dictation to Pompilii, sent a final e-mail to the IRS dated December 9, 2010,

discussing payments from individuals who had opted out of the Linerboard class.  (Dec. 9, 2010,

E-mail from John Peoples to Cindy Stuart, Langer Ex. 31, at 59; 2/28/12 Tr. 119)  The IRS

notified Peoples on February 17, 2011, that he was not eligible to receive a whistleblower award

because "the information [he] provided did not result in the collection of any proceeds."  (Feb.

17, 2011, Letter from Guadalupe Ortiz to John Peoples, Langer Ex. 47, at IRS270.)

### N.   Supreme Court Denies Certiorari; Third State Case Closed; Court Begins Proceedings on Remand

On October 4, 2010, the Supreme Court denied Peoples's petition for certiorari as to the

Third Circuit's January 14, 2010, ruling.  Peoples v. Langer, 131 S. Ct. 84 (Oct. 4, 2010).  On

October 5, 2010, while Peoples's IRS whistleblower application and the IRS audit were pending,

Peoples filed a notice in the Delaware County Court of Common Pleas that the third state case,

---

[15] The "full 24 page explanation" contains unfounded allegations that go beyond those presented in the motions to recuse.  The Court was not aware of the extent of the falsehoods Peoples had asserted until reviewing the IRS documents in February 2012.

Civil Action No. 08-1322, was "Settled Discontinued and Ended."  (Oct. 5, 2010, Praecipe, Mot. Proceed Without Evid. Hr'g Ex. 13.)  The state court issued an order closing the case on October 8, 2010.  (Civil Case Docket No. 08-1322 at 1.)

This Court issued a Memorandum & Order on October 5, 2010, addressing the issues on remand that the parties had briefed in the early months of 2010.  The Court held that due process required it to hold an evidentiary hearing "to resolve any disputed factual issues" before deciding whether to grant Langer's request for civil contempt sanctions.  In re Linerboard Antitrust Litig., 2010 WL 3928638, at *5.  However, the Court denied Peoples's request for discovery before the hearing and sustained Langer's objections to Peoples's interrogatories, concluding "that Peoples possesse[d] sufficient information to allow him to challenge Langer's claimed hours and rates at a hearing" and that "Peoples's interrogatories serv[d] no legitimate purpose[] and [were] instead designed simply to harass Langer."[16]  Id.

The Court granted the motion of Richard Rosenbaum, Esquire, to represent Peoples pro hac vice on December 10, 2010, and Rosenbaum filed Peoples's response to Langer's third contempt motion on December 27, 2010.

### O.   Efforts to Schedule Hearing on Pending Motions Unsuccessful

The Court scheduled a hearing on the three pending contempt motions for July 15, 2011.  Rosenbaum moved to continue the hearing on July 14, 2011, arguing that Peoples had misapprehended the hearing's scope and became physically ill when he learned that it would "include an effort to impose sanctions upon John F. Peoples."  (Mot. Continuance Hr'g

---

[16] For example, one interrogatory stated: "For each attorney hour spent ... describe in detail why so much time was spent and what exactly you were doing for all that time and why you could not have performed the task in less time."  In re Linerboard Antitrust Litig., 2010 WL 3928638, at *5.

Scheduled July 15, 2011, Docket no. 1080, ¶¶ 1, 7.)  The motion averred that Peoples was "not physically capable of attending."  (Id. ¶ 7.)  The Court granted the motion, continued the hearing until further Order of the Court, and ordered Rosenbaum to provide a status report as to Peoples's health on or before July 27, 2011. Following a telephone conference on July 29, 2011, the parties agreed to defer the hearing on the motions until additional information on Peoples' mental health issues and treatment became available, and the Court ordered Rosenbaum to provide a status report on or before August 29, 2011.

The Court held a telephone conference on August 30, 2011, during which it concluded that Peoples's medical submissions—two letters from Dr. Paul Jay Fink—did not provide all of the information required by the Court's July 29, 2011, Order.  Specifically, they failed to detail Peoples's claimed conditions and his prognosis.  Following the telephone conference, the Court ordered Peoples to provide an additional status report on or before September 23, 2011, and stated that, if Peoples failed to comply, the Court would consider "various alternatives including, but not limited to, the scheduling of a hearing in his absence if he is unable to participate, and the supplementing of the record by written submissions without a hearing."  (Order of Aug. 31, 2011, Docket no. 1089.)

On September 23, 2011, Rosenbaum filed two documents: a letter from Dr. Michael Weinstein, a cardiologist ("Weinstein letter"), and a letter from Dr. Alysia Cirona, a psychiatrist at the University of Pennsylvania ("Cirona letter").  (Notice of Filing Correspondence from Dr. Michael Weinstein to Dr. Lee Fleischer and Correspondence from Alysia Cirona, M.D., Docket no. 1090.)  The Weinstein letter related to a "sleep evaluation" of Peoples and contains three diagnoses: "snoring"; "obesity," to be treated with "diet and exercise"; and "hypertension,"

which is "well-controlled."  (Id. at 3.)  Dr. Cirona wrote that she saw Peoples on August 23,

2011, and recommended that he consider "Transcanial Magnetic Stimulation" to manage his

depression.  (Id. at 4.)  However, Dr. Cirona wrote that the TMS program in her department was

"on hold" until "no definitive date," and that the doctor who would have directed the program

"anticipate[d] having a new TMS program up and running later [in 2011] . . . in Cherry Hill, NJ."

(Id.)  Neither Dr. Weinstein nor Dr. Cirona opined about Peoples's alleged inability to participate

in court proceedings.

　　　　The Court concluded that the submissions failed to comply with its August 30, 2011,

Order, and that there was no evidence that Peoples was physically or mentally unable to

participate in a hearing.  (Sept. 27, 2011, Order, Docket no. 1091.)  Therefore, the Court

concluded that it would consider alternatives to resolving the contempt motions by hearing and

ordered briefing as to the parties' proposals.  (Id.)  On October 25, 2011, Langer filed a

Revised and Supplemental Fee Petition, a Motion to Proceed Without Evidentiary Hearing and to

Require Peoples to Submit Document or Declaration to Court and Langer's Counsel, and

supporting exhibits and declarations.

　　　　Peoples filed a document on November 30, 2011, that he captioned "John Peoples'

Response to the Supplemental Declaration of Robert J. LaRocca, Esquire, and Motion Filed by

John F. Peoples, Esquire, in Opposition to the Basis of Liability for Time and Costs Filed by and

in Behalf of Howard Langer, Esquire, and Counter Motion filed by John F. Peoples, Esquire, for

Counsel Fees and Costs Resulting from the Unsuccessful Litigation Filed by Howard Langer,

Esquire" ("Peoples's 11/30/11 Filing").  Langer aptly described Peoples's filing—which was

devoid of any citation to authority except in threatening Langer with sanctions under Federal

Rule of Civil Procedure 11—as follows:

> First, Mr. Peoples' response does not acknowledge that the matters presently before the Court are those remanded by the Third Circuit. . . .

> Second, though fully aware that one of the pending issues is his further violation of the court's injunction because of his submissions to the Internal Revenue Service, People makes no reference to this.

> Third, [as to Peoples' allegations of an improper relationship between Langer and the Court] . . . [t]he Third Circuit has already admonished Peoples and his counsel for repeating the false charge . . . .

(Reply & Resp. Peoples' Submission Nov. 30, 2011, at 1–3.)  Peoples also admitted in his filing that "[o]ver the years Peoples 'stewed' over the actions of Langer" and that he "call[ed] Langer's telephone after business hours and leaving messages which indicated Peoples [sic] outrage over Langer's actions, but were not threatening."  (Peoples's 11/30/11 Filing 5.)

### P.   Peoples Serves Notice of Motion for Sanctions; Langer Files Motion for Temporary Restraining Order

The Court had not yet ruled on the three contempt motions when, on January 26, 2012, Peoples filed a notice that he had served Langer with a Motion for Relief Pursuant to the Provisions of Federal Rule of Civil Procedure Rule 11, Title 28 U.S.C. Section 1927, and the Court's Inherent Power ("Peoples's Motion for Relief").[17]  (Docket no. 1104.)  Langer, through counsel Robert LaRocca, Esquire, filed a Motion for Temporary Restraining Order ("2012 TRO Motion"), alleging that paragraph sixteen of Peoples's Motion for Relief contained "purloined," "non-public and confidential" information describing "a confidential banking wire transfer, the

---

[17] Pursuant to Federal Rule of Civil Procedure 11(c)(2), "[a] motion for sanctions . . . must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."
The Court later ordered Peoples's Motion for Relief filed under seal.  (Docket No. 1116.)

exact amount and date of the wire transfer of the first distribution received by Kohn Swift & Graf [LaRocca's firm] as counsel in In re Linerboard Antitrust Litigation." (Mem. Supp. 2012 TRO Mot. 1.)

According to Langer, Peoples's possession of this information demonstrated that Peoples "significantly compromised the security and confidentiality of records at one or more of the following locations: the law offices of Mr. Langer or Mr. LaRocca; the Heffler Radetich accounting firm; or the Internal Revenue Service." (Id.) Langer averred that LaRocca contacted Rosenbaum to determine if Peoples had learned of the contents of paragraph sixteen from a public source and Rosenbaum responded that he could not answer because a response "'might implicate Mr. Peoples['s] 5th Amendment rights by placing him in fear of criminal prosecution or contempt.'" (Id. at 2 (quoting Decl. Robert Larocca, 2012 TRO Mot. Ex. B).) Langer argued that Peoples's Motion for Relief was tantamount to "blackmail" because it sought "to pressure Langer to withdraw all of the matters [] pending before this Court upon threat that the motion [would] be filed publicly at the end of 21 days." (Id. at 3.)

The Court held a hearing a telephone conference on the 2012 TRO Motion on January 31, 2012, in which LaRocca and Rosenbaum participated. During the conference, Rosenbaum stated that he was unsure of the source for the information, but he believed a public source did exist from when "the records of this case were unsealed five years ago and . . . were subsequently sealed." (Jan. 31, 2012, Conf. Tr. 8.) The Court heard argument and issued a temporary restraining order that provided, in relevant part:

> 1. John Peoples through his counsel, Richard Rosenbaum, shall by 5:00 p.m. on 2/1/12 provide the Court with the public source, if any, from which they obtained their representation of the fee obtained

Kohn Swift & Graf contained in Paragraph 16 on pp. 4-5 of the proposed Motion served by them on January 26, 2012, including the "records in the Class action" referenced as the source . . . .

2. In the event there is no public source for the information described in paragraph 1, above:

(a) John Peoples and his present and former counsel and any person having knowledge of this Order are hereby enjoined and prohibited from disclosing, publishing, copying or disseminating in any fashion any information that reveals the amounts of any distribution received by any law firm as a distribution in In re Linerboard Antitrust Litigation or any other information obtained from the files of Mr. Langer, his counsel, accountants, the Internal Revenue Service or any bank relating to In re Linerboard Antitrust Litigation or any other confidential information contained in said files.

(b) John Peoples and his counsel . . . shall appear . . . on February 3, 2012 for a Preliminary Injunction hearing.

(c) John Peoples and his counsel shall bring with them . . . all documents and electronic files containing (1) any information regarding the fees allocated to any firm in In re Linerboard Antitrust Litigation as well as all documents, electronic or otherwise, indicating the source of such information; and (2) any and all communications between John Peoples and the Internal Revenue Service relating to In re Linerboard Antitrust Litigation or Howard Langer and (3) any other non-public files they have obtained which relate to Mr. Langer's or Mr. LaRocca's law firms and/or their respective firms' clients. Specifically excluded . . . are any documents dealing solely with a distribution received by John Peoples.

(d) John Peoples and his counsel and anyone provided with this Order are directed not to destroy any documents, including electronic documents, described in (c) above.

3. Mr. Peoples and his counsel and any person having knowledge of this order are admonished that any violation of this order will be deemed a contempt and will result in sanctions.

> 4.  Mr. Peoples and his counsel are directed to furnish a copy of this
> order immediately upon Frank Marcone.[18]

(Jan. 31, 2012, Temporary Restraining Order ("2012 TRO"), Docket no. 1106.)  Notwithstanding

paragraph 2(b) of the 2012 TRO, the Court stated during the conference that it was acceptable for

Peoples to make alternate arrangements to attend, including, if necessary, participating by

videoconference or telephone.  (Jan. 31, 2012, Conf. Tr. 22.)

    During the afternoon on February 1, 2012, Rosenbaum sent to the Court and to Langer,

through counsel, a letter stating that he had "not yet been able to secure the copy of the check

which need[ed] to be produced" and requesting an additional twenty-four hours to provide the

public source of the paragraph-sixteen information.  (Feb. 1, 2012, Letter from Richard

Rosenbaum to Court, Docket no. 1109.)  Langer stated that he would agree to an extension to

February 2, 2012, at 5:00 p.m. but wanted a representation of "what [Rosenbaum] underst[ood]

this check to represent" more expediently.  (Feb. 1, 2012, Letter from Robert LaRocca to Court,

Docket no. 1108.)  The Court granted the extension to 5:00 p.m. on February 2, 2012, and

required that Rosenbaum provide the information earlier if he obtained it.  (Feb. 1, 2012,

Temporary Restraining Order ("2/1/12 Extension"), Docket no. 1107.)

    On February 2, 2012, Rosenbaum sent a letter to the Court with a one-page attachment;

he wrote that the attachment was a "Wire Transfer Report" that "formed the basis of the factual

statement" in paragraph sixteen of Peoples's Motion for Relief.  (Feb. 2, 2012, Letter from

Richard Rosenbaum to Court, Langer Ex. 6, at 1[19].)  Rosenbaum further wrote: "It is my

---

[18] Rosenbaum objected to paragraphs 1 and 4 of the 2012 TRO but did not object to
paragraphs 2 or 3.  The Court overruled the objections.

[19] The letter and attachment were not filed but were introduced in evidence at the
Preliminary Injunction Hearing.  The Court ordered them placed under seal to protect the

understanding that the attached document was obtained from Republic 1st Bank via a subpoena issued in the Pennsylvania state case." (Id.)  That same day, Langer filed a Motion for Preliminary Injunction, in which he asked that the 2012 TRO be reissued as a preliminary injunction.

### Q.   Preliminary Injunction Hearing and Related Proceedings

#### 1.   February 3, 2012, Hearing

The Court began the hearing on Langer's Motion for Preliminary Injunction on February 3, 2012.  Langer, LaRocca, and Rosenbaum were present; Peoples was not.  The parties first addressed Peoples's absence.  Rosenbaum provided a letter from Dr. Fink, which stated that Peoples was "getting better" but still suffering "a tremendous amount of anxiety and depression." (Feb. 2, 2012, Letter from Dr. Paul Jay Fink to Court.)  Dr. Fink opined that Peoples was "unable to participate in legal matters." (Id.)  After reviewing the letter, LaRocca asked the Court to hold Peoples in contempt for failing to comply with the part of the 2012 TRO requiring his presence, taking the position that the February 2, 2012, Fink Letter did not excuse him.  (2/3/12 Tr. 4–5.) Rosenbaum did not offer other medical evidence but argued that Peoples was "unable to get out [of bed] and deal with and cope with society," even to participate by telephone, and that his absence was "not anything that is willful." (Id. at 5–7.)  Rosenbaum further stated that he would waive Peoples's presence and was prepared to proceed.  (Id. at 6.)  The Court took Langer's oral motion under advisement.  (Id. at 7–8.)

The parties next turned to Peoples's compliance with paragraph 2(c) of the 2012 TRO, which required Peoples to bring documents related to the Linerboard fee allocation to the

_____

financial information contained therein.

hearing.  Rosenbaum stated that he had turned over every responsive document in his possession when he sent the Wire Transfer Report on February 2, 2012.  (Id. at 9.)  However, he acknowledged that he had not investigated Peoples's office personally because he was traveling to the hearing from Florida and had relied on Peoples, Pompilii, and Cristal.  (Id. at 9–12.)  Rosenbaum stated that although "Peoples . . . stated he wasn't in possession of any documents," Pompilii had stated "that Mr. Peoples ha[d] some documents" that were responsive "in a box or boxes" at his house.  (Id. at 10, 14–16.)  Rosenbaum was "unable to secure" those documents before the hearing.  (Id.)  The Court deferred ruling on whether Peoples had complied with paragraph 2(c) of the 2012 TRO until the conclusion of the hearing.

During the Preliminary Injunction Hearing, Langer presented evidence regarding the three subpoenas for the RFB financial records as discussed in section II.K supra.  (Id. at 34–35.)  He moved into evidence the documents relating to those subpoenas, which were received without objection, under seal.  (Id. at 38–41.)  Langer also presented the testimony of three witnesses: himself; Robert Opferman of RFB; and Frank Marcone, Peoples's former counsel.  Langer then rested his case.  (Id. at 93.)

The Court and parties addressed a number of other issues at the conclusion of the hearing.  Rosenbaum moved for a continuance for additional time to obtain the documents specified in paragraph 2(c) of the 2012 TRO.  (Id. at 93–94.)  Langer consented to the continuance on condition that the 2012 TRO remain in place.  (Id. at 94–95.)  The Court granted Rosenbaum's request, scheduled the second part of the hearing for February 28, 2012, and ordered that the 2012 TRO and 2/1/12 Extension would remain in place until further Order of the Court.  The Court also ordered Rosenbaum to serve copies of the 2012 TRO and 2/1/12 Extension on

Peoples, Cristal, Pompilii, and "all other persons having knowledge of the subject matter of the Temporary Restraining Order, as amended." (Order of Feb. 3, 2012, Docket no. 1115, at 1.)

The Court further concluded that it would receive evidence on all three pending contempt motions after the termination of the Preliminary Injunction Hearing. To facilitate addressing the Third Contempt Motion, the Court ordered the parties to submit two agreed-upon orders: "one directing John Peoples, Esquire, to provide copies of letters sent by the said John Peoples, Esquire, to the Internal Revenue Service with respect to the In re: Linerboard Antitrust Litigation, copies of which are in the possession of Mr. Peoples or his present or former agents, servants, or employees, and, the other directing the Internal Revenue Service to produce copies of all such letters." (Id. at 1–2.) Rosenbaum, on Peoples's behalf, consented to requiring document production from the IRS. (2/3/12 Tr. 101 ("THE COURT: [L]et's see if there's any objection. We're talking about the letters to and from the IRS with respect to the audit the IRS conducted of Mr. Langer, really of the Linerboard litigation income and expenses. MR. ROSENBAUM: I have no objection on behalf of Mr. Peoples.").) Finally, the Court ordered that Peoples's Motion for Relief be filed under seal and required Langer to file a response. (Id. at 2.)

### 2. Proceedings Between Hearings

Rosenbaum notified the Court on February 6, 2012, that he had served the 2012 TRO and 2/1/12 Extension, (Notice of Compliance, Docket No. 1122), and the parties provided two agreed-upon forms of order to the Court on that same date, which the Court signed and issued. The first required Rosenbaum, "with the assistance of Steven Cristal and Mr. Peoples' former staff," to "make all reasonable efforts to locate and secure the originals and all copies (including copies put into electronic format for storage on computers) of the documents identified in

Paragraphs 2(a) and 2(c) [of the 2012 TRO]."  (Order of Feb. 6, 2012, Regarding Peoples's Documents ("2/6/12 Peoples Order"), Docket no. 1118, at 1–2.)  The second Order required the IRS to furnish to LaRocca "copies of any documents in its possession that it received from or sent to John Peoples (or those working on his behalf), or which reflect any meeting with John Peoples (or those working on his behalf), and which mention or refer to Howard Langer or In re Linerboard Antitrust Litigation."  (Order of Feb. 6, 2012, Regarding IRS Documents ("2/6/12 IRS Order"), Docket no. 1119, at 1.)  The 2/6/12 IRS Order provided that any documents containing confidential financial data would be disclosed only to LaRocca, Langer, and Rosenbaum until further Order of the Court.  (Id. at 2.)

### i.    Peoples's Compliance with Document Production Order

In a status report dated February 15, 2012, Rosenbaum sent a letter to the Court detailing his efforts to locate the documents specified in the 2/6/12 Peoples Order.  Those efforts included speaking to Peoples, Pompilii, Marcone, and Palmer. (Feb. 15, 2012, Letter from Richard Rosenbaum to Court, Langer Ex. 28, at 1–2.)  Pompilii went "through boxes of documents on three separate occasions at a storage shed on Mr. Peoples's property" and found "banking materials retrieved as a result of a subpoena issued under a state court case number," but "some documents . . . may have been inadvertently lost or misplaced during the closing of John Peoples' office."  (Id.) According to Rosenbaum, Marcone recalled forwarding his case file to Palmer, but Palmer remembered never having the file.  (Id.)  Marcone received documents from Peoples even after he stopped representing him, but those documents were "lost during the closing" of Marcone's office.  (Id. at 2.)

On February 16, 2012, Rosenbaum certified his compliance with the 2/6/12 Peoples Order, stating that "[a]ll documents obtained pursuant to paragraph 2(c) [of the 2012 TRO]" were provided to LaRocca by overnight mail on February 16, 2012.  (Notice of Compliance with Court Order Dated February 6, 2012, Docket no. 1122, at 1.)  Rosenbaum stated that all the documents "were obtained via email from Sharon Pompilii," who found them "in a storage shed on John Peoples' property which housed all of his business files and records."  (Id.)

### ii.      IRS Document Production

On February 17, 2012, on behalf of the IRS, Assistant United States Attorney Veronica Finkelstein ("AUSA Finkelstein") faxed the Court and parties, through counsel, a letter in response to the 2/6/12 IRS Order.[20]  She stated that the IRS's position was that it was unable to comply with the order without violating the privacy protections set forth in Section 6103 of the Internal Revenue Code.[21]

LaRocca responded to AUSA Finkelstein's correspondence by letter dated February 21, 2012, asking the Court to compel the IRS to comply with the 2/6/12 IRS Order.  (Feb. 21, 2012, Letter from Robert LaRocca to Court, not docketed.)  LaRocca also stated that he had just received the documents from Rosenbaum discussed in section II.Q.2.i supra, which, according to LaRocca, "show[ed] that Mr. Peoples violated the All Writs Act Injunction by instigating the IRS Audit."  (Id. at 2.)

---

[20] AUSA Finkelstein became involved with this case at a very late stage, but her efforts in resolving the matters concerning the IRS were invaluable.  The Court thanks her for her assistance.

[21] See 26 U.S.C. § 6103(a) (stating "[g]eneral rule" that, except as specifically authorized, "[r]eturns and return information shall be confidential").

During a telephone conference on February 24, 2012, in which LaRocca, Rosenbaum, and AUSA Finkelstein participated, AUSA Finkelstein stated that the IRS's position that it could not comply with the 2/6/12 IRS Order derived from its statutory obligation to keep taxpayer information confidential to protect private information and the IRS's internal deliberative processes.  However, the IRS could comply if the Order reflected the consent of both the taxpayer and purported whistleblower—i.e., both Peoples and Langer.  The Court issued an amended Order dated February 24, 2012, explicitly stating that both parties had consented and requiring the IRS to produce any such documents before the continued hearing date.  (Order of Feb. 24, 2012, Docket no. 1127, at 1–2.)  The Order permitted the IRS to invoke privilege regarding the documents if it deemed it appropriate. The IRS complied, producing two sets of documents introduced into evidence under seal as Langer Exhibits 46 and 47.

### iii.    Sanctions Filings

On February 17, 2012, Langer filed a response to Peoples's Motion for Relief.  He also filed a Cross-Motion of Howard Langer and Langer Grogan & Diver for Sanctions Under 28 USC § 1927 and the Inherent Power of the Court ("Langer Cross-Motion").  In the cross-motion, Langer argued that the Court should impose sanctions against Rosenbaum and his law firm, Arnstein & Lehr LLP, for serving the Notice of Service of People's Motion for Relief on January 26, 2012.  According to Langer, sanctions were appropriate because the motion relied on information—the amount of fees LaRocca's firm received as counsel fees in this case—that Peoples obtained illegally and because the motion was an attempt to use the illegally obtained information "as a weapon of extortion or blackmail."  (Cross-Motion 14.)  Langer asked the

41

Court to require reimbursement of "[t]ime and expenses . . . incurred by Mr. LaRocca and Mr. Langer that were necessary on an emergency basis." (Id. at 16.)

Rosenbaum responded first by withdrawing his Notice of Service of Peoples's Motion for Relief on February 20, 2012. (Notice of Withdrawal, Docket no. 1125, at 1.) He then filed John Peoples' Reply to Cross Motion of Howard Langer and Langer, Grogan & Diver's Motion for Sanctions (Docket no. 1128) ("Reply to Langer Cross-Motion"), in which he made several arguments against the imposition of sanctions. First, Rosenbaum argued that the "fee-shifting" argument he made on Peoples's behalf in the Motion for Relief "had merit"—or was at least "a debatable theory." (Reply to Langer Cross-Motion 1–3.) Second, the Motion for Relief was not served in an attempt to blackmail Langer. Rosenbaum stated that Peoples intended only to "place[] Langer on notice of [Peoples's] intent to seek sanctions if Langer did not withdraw his attorney's fee request," (id. at 1–2), and, "depending on Langer's response to the motion," the Motion for Relief "was not necessarily going to be filed." (Id. at 3.)

### iv.   Langer's Memorandum Addressing IRS Communications and Setting Forth Relief Requested

Following a Telephone Conference on February 23, 2012, in which the Court told the parties it intended to address the issues presented by the Langer Cross-Motion at the continued Preliminary Injunction Hearing, the Court ordered the parties to file supplemental memoranda addressing the documents Rosenbaum had sent to LaRocca on February 16, 2012, which allegedly showed that Peoples had instigated the IRS audit, as well as any other matters the parties deemed appropriate. (Order of Feb. 23, 2012, Docket no. 1126, at 1.)

42

Langer filed a supplemental memorandum; Peoples did not.  Langer's Memorandum Addressing IRS Communications and Setting Forth Relief Requested ("Langer Relief Memorandum") asked the Court to find that Peoples committed contempt on eight separate occasions as part of an "intentional, interlocking pattern" between February 2005 and October 2010.  (Langer Relief Mem. 2–3.)  Langer also requested various forms of relief, which this Memorandum addresses in section V, infra.

**v.      Peoples's Attendance at Hearing**

During the February 23, 2012, Telephone Conference and in the Court's Order of the same date, the Court ruled that Peoples would be permitted to participate in the continued Preliminary Injunction hearing by telephone or video-conference if he were unable to attend in person.

Just before the hearing on February 28, 2012, Rosenbaum filed additional correspondence from Dr. Fink and Dr. David Walzer regarding Peoples's medical conditions.  (Feb. 28, 2012, Notice of Filing Correspondence ("2/28/12 Medical Documentation"), Docket no. 1130.)  These letters, introduced in evidence at the hearing as Peoples Exhibits 1 and 2, are significantly more detailed and relevant than prior medical documentation submitted by Peoples.  Dr. Fink opined that Peoples suffers from "serious depression with a tremendous amount of suicidal intent" and that his health difficulties are aggravated by the "constant pressures" posed by this case.  (2/28/12 Medical Documentation 2.)  Dr. Walzer provided additional detail as to the treatment Peoples recently underwent for depression, including "electroconvulsive therapy," which also had grievous negative side effects, and "transcranial magnetic stimulation treatments," which has had serious side effects but has achieved some positive results.  (Id. at 4.)  Dr. Walzer further opined

43

that, as of February 22, 2012, Peoples was "unable to actively participate in litigation" and "exposing [him] to courtroom stress could be very detrimental and permanently damage his mental stability." (Id.)

Rosenbaum stated at the February 28, 2012, hearing, that he was offering the letters "for mitigation," not as grounds for a continuance. (2/28/12 Tr. 3–4.) Accordingly, by agreement of the parties, the Court proceeded with the Preliminary Injunction hearing in Peoples's absence. (Id.)

### 3.     February 28, 2012, Hearing

Although Langer had rested at the end of the first hearing, given the events that transpired after February 3, 2012, the Court permitted Langer to present additional evidence.[22] (2/28/12 Tr. 2.) Langer presented the testimony of Walter Timby, Esquire; David Yarnall, who works in computer forensics and technology management; Sharon Pompilii; H. Laddie Montague, Junior, Esquire; and Robert LaRocca, Esquire. Timby provided testimony as to his firm's limited representation of Peoples for the filing of the IRS whistleblower complaint as well as to the RFB financial documents in his firm's possession, which Peoples had sent Timby as background for filing the IRS complaint. (Id. at 13–33.) Pompilii testified about: her role in responding to the Court's Orders following entry of the 2012 TRO; the operation of Peoples's law office, including

---

[22] Before resuming the Preliminary Injunction hearing on February 28, 2012, the Court addressed AUSA Finkelstein regarding the IRS document-production issue so that the relevant facts as set forth in section II.Q.2.ii supra would be on the record.

Langer Exhibit 47, which is the second set of IRS documents, and Langer Exhibit 48, the full text of Palmer's October 2008 letter to Peoples and a related e-mail message, were not available at the time of the hearing. By agreement of the parties, (Feb. 29, 2012, Hr'g Tr. ("2/29/12 Tr.") 2–6), LaRocca provided them to Rosenbaum and the Court after the hearing, and Rosenbaum notified the Court that he had no objection to their admission on behalf of Peoples. Accordingly, the Court admits Langer Exhibits 47 and 48. Langer Exhibit 47 shall be placed under seal.

the filing system and computer network setup; her involvement in analyzing the RFB financial

records and in corresponding with the IRS; and Peoples's medical conditions, as well as other

topics.  LaRocca provided additional detail as to the fees and costs that Langer is seeking as a

contempt sanction, and Montague's testimony addressed the reasonableness of the fees Langer

requested.  (Id. at 136–37.)

Rosenbaum did not call any witnesses to testify on Peoples's behalf.  He offered into

evidence the medical documentation discussed in section II.Q.2.iv supra.  That evidence was

received.  Peoples then rested.

### 4.    February 29, 2012, Hearing

The Court heard the parties' closing arguments on February 29, 2012.  The parties also

agreed on some of Langer's requests for relief, and the Court issued a partial ruling regarding the

Langer Cross-Motion.

As to the Langer Cross-Motion, LaRocca had argued that the Court should require

Rosenbaum or his law firm to reimburse the fees and costs that Langer occurred in litigating the

matters related to the 2012 TRO.  (See 2/28/12 Tr. 44 ("[W]e think it's appropriate since Mr.

Rosenbaum's firm drafted and signed both of the motions, the one in November of 2011 that first

threatened the sanctions [and the January 26, 2012, notice of service].").)  Rosenbaum responded

that, at the time when he served the Notice of Service of Peoples's Motion for Relief, he was

unaware that Peoples had obtained the paragraph-sixteen information through an illegal

subpoena.  (See id. at 48; id. at 53-55 ("I was told that it was part of a spreadsheet of information

that [Peoples] had obtained and I didn't know anything of the subpoenas that were issued.").)

Had he known the source of the information, Rosenbaum argued, he "definitely" would not have

45

included the information about the <u>Linerboard</u> counsel fees.  (<u>Id.</u>)  Rosenbaum argued that

sanctions against him and his firm were not appropriate because the true cause of the 2012 TRO

and the concerns regarding the disclosure of financial records was Peoples's improper service of

the subpoenas in the third state case.  (<u>See id.</u> at 55 (Rosenbaum: "I didn't know that that suit

was what brought the subpoenas that brought all the documents. . . . [U]ltimately, it went back to

Mr. Peoples and the filing of that subpoenas.  And that's what caused paragraph 16 and that's

what caused the additional fees and that's why I urged the Court not to order my firm to pay fees

and costs surrounding this."); <u>id.</u> at 59–60 ("Mr. Peoples' subpoena is what started us down this

track and I believe that Mr. Peoples is the one who should be responsible for what ended up

being the [2012] TRO.").)

    The Court issued an oral ruling that it would not impose sanctions against Rosenbaum or

his firm for the events that led to the 2012 TRO and related proceedings.  (2/29/12 Tr. 64.)  The

Court agreed with Rosenbaum that "the issue [leading to the service of Peoples's Motion for

Relief and the 2012 TRO proceedings] was the submission of the data that was included in

paragraph 16," which was attributable to Peoples and the three subpoenas Peoples served on RFB

in violation of the All Writs Act Injunction.  (<u>Id.</u>)  Although "Rosenbaum should have asked

more questions," the Court held that sanctions against him would be "overkill" and that it would

impose sanctions against Peoples instead.  (<u>Id.</u>)

### 5.    Frank Marcone

    In the proposed form of order attached to his Relief Memorandum, Langer asked the

Court to "note" that Frank Marcone was improperly practicing law despite being suspended from

doing so.[23]  LaRocca reiterated this request at the February 29, 2012,  closing argument.  (2/29/12

Tr. 40 ("[Paragraph] eight is just a one-line recognition of what the record amply reflects here,

that there has been repeated and continued evidence of Mr. Marcone's practice of law . . . .").)

Langer based his request on two alleged instances of unauthorized practice.  The first

related to Peoples's withdrawal of the second state case and filing of the third state case in

January 2008.  Marcone testified at the February 3, 2012, Preliminary Injunction hearing as

follows:

> Q [by LaRocca]: Were you aware that John had filed this writ of
> summons?
> [. . .]
>
> A: Yes.
>
> Q: Okay.  And when did you become aware of it?
>
> A: I'd say contemporaneously with it being filed because I did have
> a conversation when I had heard that a complaint had been filed and
> I had nothing to do with filing that complaint because I objected to it

---

[23] The Pennsylvania Supreme Court suspended Marcone from the practice of law for five years effective September 10, 2004.  Office of Discip. Counsel v. Marcone, No. 122 DB 2000 (Pa. Sept. 10, 2004).  On February 18, 2009, this Court—the United States District Court for the Eastern District of Pennsylvania—suspended him from practice before it for two years by reason of his unauthorized practice of law and provided that he could not apply for reinstatement in this Court until he had become a member in good standing of the bar of the Supreme Court of Pennsylvania.  In re Frank J. Marcone, Misc. No. 08-164, Docket no. 15 (E.D. Pa. Feb. 18, 2009).  The Pennsylvania Supreme Court then imposed an additional two-year suspension effective December 29, 2009.  In re Frank J. Marcone, No. 1510 Disciplinary Docket No. 3 (Pa. Dec. 29, 2009), docketed in E.D. Pa. Misc. No. 08-164 as document no. 36.  The Third Circuit affirmed this Court's suspension of Marcone from practice before it on October 19, 2010.
Marcone moved for reinstatement in this Court on May 2, 2011, averring that he had "filed a preliminary Petition for Reinstatement" with the Pennsylvania state courts.  Mot. Readmission, Misc. No. 08-164, Docket no. 38.  Marcone later withdrew this motion, and this Court ordered that he not seek readmission until he is "unconditionally readmitted . . . by final order" of the Pennsylvania Supreme Court.  June 23, 2011, Order, Misc. No. 08-164, Docket no. 43.  As of July 13, 2012, Marcone's state court license to practice law remains suspended.

> and said I didn't like it.  I thought that they should do it by summons
> and they did.[24]

(2/3/12 Tr. 85–86.)  Although he referred Peoples's state case to Palmer, Marcone stated that

he—Marcone—"did not get involved in anything in [the state court suit]" because he "did not

want to be accused of practicing law without a license."  (Id. at 90–91.)

The second instance of alleged unauthorized practice occurred on or about February 22,

2012, when LaRocca contacted Timby to determine if Gibson & Perkins, P.C., was in possession

of any of the RFB financial records.  Initially, Timby told LaRocca that he could not answer

based on a conversation Timby had with Marcone in which Timby understood Marcone to be

saying that Timby should not speak to LaRocca about Peoples's IRS whistleblower application.

(2/28/12 Tr. 27.)  Asked whether he believed that Marcone was acting as People's counsel when

he made this statement, Timby testified:

> Frank Marcone did not say to me during the course of the
> conversation he's representing Mr. Peoples.  During the course of the
> conversation and from past history, I knew that there was a
> relationship between John Peoples and Frank Marcone where Frank
> Marcone had performed legal services in the past for him.  When
> Marcone ended up on the phone with us, it did not surprise me that he
> was speaking on behalf of Peoples and that's how I took it.

(Id. at 28.)  Timby later realized that Marcone was not licensed, and, after receiving a full history

of the Court's Orders and a subpoena from LaRocca, produced the documents.  (Id. at 14, 23.)

Based on these two incidents, LaRocca argued that the Court should make a "prophylactic

. . . record" for review should Marcone apply for reinstatement.  (2/29/12 Tr. 42–43.)  When

LaRocca advanced this argument, both he and the Court believed that Marcone would be eligible

---

[24] This averment is inconsistent with other evidence as to the timeline of these events;
Palmer did not enter his appearance in the third state case until September 3, 2008, nine months
after Peoples filed the praecipe for writ of summons.  (See Civil Case Docket No. 08-1322.)

to seek reinstatement in late 2012.  (Id.)  At the conclusion of closing argument, the Court stated

that, although it would permit Marcone to file a response, the Court intended to "report to [its]

colleagues what [it] consider[ed] to be conduct in this case that [was] not in complete

compliance" with the terms of Marcone's suspension should Marcone apply for reinstatement.

(Id. at 65; see also id. at 66 ("[Y]ou, in essence, gave legal advice with respect to the court papers

filed in Delaware County in December of . . . 2007 and January of 2008.").)

Marcone, who was present at closing argument, addressed the Court and stated that he

has already applied for reinstatement.  (Id. at 66.)  Although the Court told Marcone that he could

file a written response to the allegations of unauthorized practice, Marcone summarized his

position orally, stating that any advice he gave Peoples in December 2007 or January 2008 was

given merely as a friend, possibly at Palmer's request.  (See id. at 67–68 ("You should do it with

a summons and do discovery.  That was all I said and it was in compliance with a discussion I

had with Steve Palmer.").)  LaRocca responded that he believed some of Marcone's statements

to be factually inaccurate.  (Id. at 70.)  The Court ordered Marcone and LaRocca to file written

memoranda on these issues.  (Id. at 70–71.)

### R.    Langer's Requested Relief

The details of the types of relief that Langer asks the Court to impose as sanctions for

civil contempt are contained in the proposed form of Order as revised following the conclusion

of the Preliminary Injunction hearing and as explained by LaRocca during his February 29, 2012,

closing argument.  The Court addresses relief in section V infra.

**III.     DISCUSSION—DUE PROCESS AND PEOPLES'S ATTENDANCE**

As a threshold matter, the Court addresses the due process required before civil contempt sanctions are imposed, as well as the related issue of Langer's oral motion that Peoples be held in contempt for failing to attend the February 3, 2012, hearing.

**A.     Due Process Required Before a Finding of Civil Contempt**

In its October 5, 2010, Memorandum, the Court discussed  the procedural protections implicated by civil contempt sanctions in length, In re Linerboard Antitrust Litig., 2010 WL 3928638, at *3–5, and will summarize them only briefly in this Memorandum.

"Due process generally requires an opportunity granted at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." Roe v. Operation Rescue, 920 F.2d 213, 217 (3d Cir. 1990).  In the context of civil contempt, due process is satisfied by "notice and an opportunity to be heard," United States v. Ayres, 166 F.3d 991, 995 (9th Cir. 1999), quoted in In re Linerboard Antitrust Litig., 2010 WL 3928638, at *3.  A hearing is necessary in cases involving disputed issues of material fact, but where the parties are given ample notice and an opportunity to respond and the respondent fails to present any arguments creating any material issue of fact, due process does not require that respondent have the benefit of a hearing.  See Tranzact Techs., Inc. v. 1Source Worldsite, 406 F.3d 851, 855 (7th Cir. 2005); Ayres, 166 F.3d at 995–96.

The requirements of due process are satisfied, and adjudication of the contempt motions is now appropriate.  Ruling on the three contempt motions without a hearing would have been appropriate, given Peoples's failure to submit medical evidence establishing that he was unable to attend a hearing in July or August 2011 and his failure to file a brief setting forth his proposed

procedure for resolving the contempt motions, in violation of the Court's September 27, 2011, Order.  Nonetheless, the Court permitted both parties to offer evidence regarding the contempt motions in conjunction with the Preliminary Injunction Hearing on February 3, 28, and 29, 2012. Peoples waived his right to be present during those hearings, both through his failure to attend despite adequate notice[25] and through Rosenbaum's oral waiver of Peoples's presence.  (2/3/12 Tr. 5–6 (stating that "we have waived his appearance and we're prepared to go forward"), 2/28/12 Tr. 3–4 (stating that "even if Mr. Peoples is not here, we're prepared to go forward").) During the hearings, Rosenbaum had the opportunity to present evidence in support of Peoples's position, to cross-examine Langer's witnesses, and to challenge Langer's documentary evidence.

The Court thus concludes that Peoples has had the benefit of the adversary hearing ordered in October 2010 notwithstanding the fact that he effectively waived his right to that hearing by continued noncompliance with the Court's Orders from July to November 2011. Accordingly, the requirements of due process are met, and the Court may proceed to resolve Langer's contempt motions.

**B.    Langer's Oral Motion to Hold Peoples in Contempt for Failure to Attend Preliminary Injunction Hearing**

The Court took under advisement Langer's oral motion that the Court hold Peoples in contempt for failing to comply with paragraphs 2(b) and 2(c) of the 2012 TRO, which required Peoples and his counsel to appear for the Preliminary Injunction hearing on February 3, 2012, and bring with them certain documents.  Langer's oral motion is denied for several reasons. First, the medical evidence Rosenbaum presented at the February 28, 2012, hearing, through

---

[25] The Court stated that it would permit Peoples to participate remotely by telephone or videoconference, but Peoples did not avail himself of those options.

letters from Doctors Fink and Walzer and through Pompilii's testimony, provided much stronger support for Peoples's claim that he was unable to attend due to his medical conditions, which afflict both him both physically and mentally.  Second, the Court had previously excused Peoples from being physically present at the hearing.  (Jan. 31, 2012, Conf. Tr. 22.)  Third, to the extent that Langer's oral motion arose from Peoples's incomplete compliance with the document production order, Rosenbaum remedied that shortcoming before the February 28, 2012, hearing. Fourth, as discussed in section III.A supra, Rosenbaum consented to proceeding with the hearing in Peoples's absence.

For these reasons, the Court denies Langer's oral motion that Peoples be held in contempt for failing to attend the February 3, 2012, hearing.

## IV.     DISCUSSION—PEOPLES'S EIGHT ACTS OF CONTEMPT

The Court next addresses the alleged violations of the All Writs Act Injunction, the 2005 TRO, and the 2005 Consent Stipulation Order.  This Memorandum addresses the standard for civil contempt, then evaluates each of the eight instances on which Peoples is alleged to have committed civil contempt.

### A.     Standard for Civil Contempt

Civil contempt does not require trial by jury; instead, it is "imposed by the judge upon a finding that one has failed to comply with a valid court order."  United States v. Harris, 582 F.3d 512, 514 (3d Cir. 2009) (citing Shillitani v. United States, 384 U.S. 364, 370–71 (1966)).  A party seeking civil contempt must show that (1) a valid court order existed, (2) the alleged contemnor had knowledge of the order, and (3) the alleged contemnor disobeyed the order.  Fed. Trade Comm'n v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010).  The movant must

prove each element by clear and convincing evidence, and "'ambiguities must be resolved in favor of the party charged with contempt.'"  Id. (quoting John T. v. Del. Cnty. Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003)).

"[W]illfulness is not a necessary element of civil contempt," International Marketing, Inc. v. Counteract Balancing Beads, Inc., 48 F. App'x 372, 375 (3d. Cir. 2002), so "good faith is not a defense to civil contempt," Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994). An alleged contemnor may, however, establish a defense of substantial compliance by showing that he "(1) has taken all reasonable steps to comply with the valid court order, and (2) has violated the order in a manner that is merely technical or inadvertent." Lane Labs-USA, 624 F.3d at 591 (quotations omitted).

### B.   Validity of Orders

#### 1.   All Writs Act Injunction

The All Writs Act Injunction has been in effect since July 6, 2004, with the exception of the period from July 15, 2008, to October 2, 2008.  At this stage in the proceedings, the Court's authority to issue the All Writs Act Injunction in 2004 and reissue it in October 2, 2008, is beyond question.  See In re Linerboard Antitrust Litig., 361 F. App'x at 395–97 (holding that "the District Court had authority to issue the All Writs Injunction precluding further state court litigation over the allocation of Linerboard fees under both the 'in aid of jurisdiction' and the relitigation exceptions to the Anti–Injunction Act" and that "Peoples's attempt to relitigate his fee [by filing the second state court suit] . . . justified reinstatement of the injunction").

### 2.    2005 TRO and 2005 Consent Stipulation Order

The 2005 Emergency TRO was in effect from March 22, 2005, through July 15, 2008,

and the 2005 Consent Stipulation Order was in effect from September 8, 2005, through July 15,

2008.  The validity of these orders—both of which Peoples agreed to when the Court issued

them—is also firmly established.  See In re Linerboard Antitrust Litig., 361 F. App'x at 397–99;

see also In re Linerboard Antitrust Litig., 2008 WL 2758442, at *10–11 (discussing the Court's

authority to issue the orders under the All Writs Act and citing, inter alia, Pa. Bureau of Corr. v.

United States Marshals Serv., 474 U.S. 34, 40 (1985)).  The Court has previously rejected

Peoples's arguments that the Court lacked jurisdiction to issue the orders and that the orders

violated his First Amendment rights and need not address them again in this Memorandum.  See

In re Linerboard Antitrust Litig., 2008 WL 2758442, at *13–14.

### 3.    Conclusion

The Court concludes that its three orders were valid and in effect as follows: the All Writs

Act Injunction, from July 6, 2004, to the present, with the exception of the period from July 15,

2008, to October 2, 2008; the 2005 Emergency TRO, from March 22, 2005, to July 15, 2008; and

the 2005 Consent Stipulation Order, from September 8, 2005, to July 15, 2008.

### C.    Knowledge of Orders

The Court has also already found that Peoples had knowledge of the All Writs Act

Injunction, the 2005 Emergency TRO, and the 2005 Consent Stipulation Order.  See In re

Linerboard Antitrust Litig., 2008 WL 2758442, at *14–15 (discussing that Peoples was "aware

that the Emergency TRO and the Consent Stipulation Order prohibited him from having any

contact with Langer" and that "Peoples conceded several times during the Contempt Hearing that

54

he knew of the All Writs Act Injunction").  The Court thus concludes that Peoples had

knowledge of the All Writs Act Injunction "some time prior to September or October of 2004,"

id. at *15 (quoting 5/3/07 Tr. 28), and had knowledge of the 2005 TRO and 2005 Consent

Stipulation Order no later than September 8, 2005, when his prior counsel, George Bochetto,

Esquire, signed the Consent Stipulation Order incorporating the 2005 Emergency TRO and

acknowledged that he discussed its contents with Peoples, who consented to its issuance, id. at

*14.

### D.    Violations of Orders

Having concluded that the three Orders at issue were valid and that Peoples was aware of

them, the next issue is whether Peoples violated the Orders. Langer argues that eight separate

violations occurred, two of which the Court already found constituted contempt in its

Memorandum dated July 15, 2008.

### 1.    Contempt One: February 2005 Letter to Disciplinary Board

Langer contends that Peoples violated the All Writs Act Injunction when he sent a letter

dated October 19, 2005, to the Disciplinary Board of the Supreme Court of Pennsylvania, filing a

complaint against Langer for allegedly "refus[ing] to honor [Langer's] contractual responsibility

to pay [Peoples] a co-counsel fee of approximately $4.7 million dollars."  In re Linerboard

Antitrust Litig., 2008 WL 2758442 at *16.  The Court already concluded that Peoples violated

the All Writs Act Injunction by sending this letter and that the letter was not protected by

Pennsylvania Rule of Professional Conduct 8.3(a).[26]  See id.  That conclusion was undisturbed by

---

[26] "A lawyer who knows that another lawyer has committed a violation of the Rules of
Professional Conduct that raises a substantial question as to that lawyer's honesty,
trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional
authority."  Pa. R. Prof. Conduct 8.3(a).  The Court found that Peoples's report was made

the Third Circuit, which remanded the case to this Court for reconsideration of its decision not to

impose sanctions on Peoples.

Accordingly, the Court reaffirms its earlier conclusion as set forth in the Memorandum

dated July 15, 2008, that Peoples violated the All Writs Act Injunction by sending a letter dated

October 19, 2005, to the Disciplinary Board.

### 2.    Contempt Two: June 29, 2006, Harassing Telephone Call

According to Langer, Peoples violated the 2005 Emergency TRO and 2005 Consent

Stipulation Order by leaving a telephone message on Langer's voicemail on June 29, 2006,

stating "I didn't forget you."  As with the Disciplinary Board letter, the Court found that the June

29, 2006, telephone message constituted contempt in its July 15, 2008, Memorandum, id. at *14,

and the Third Circuit remanded the case for consideration of civil contempt sanctions as a

remedy, In re Linerboard Antitrust Litig., 361 F. App'x at 399.

The Court thus reaffirms the conclusion set forth in the Memorandum dated July 15,

2008, that Peoples violated the 2005 Emergency TRO and 2005 Consent Stipulation Order by

leaving a telephone message on Langer's voicemail on June 29, 2006.

### 3.    Contempt Three: Filing of Second State Case on December 31, 2007

Langer argues that Peoples violated the All Writs Act Injunction by filing the second state

case, Peoples v. Langer, Civil Action No. 07-18531, in the Delaware County Court of Common

Pleas on December 31, 2007.  The revelation that Peoples filed the second state case was one of

the reasons the Court reinstated the All Writs Act Injunction in the Memorandum and Order

---

"precisely" for the reasons prohibited by Rule 8.3(a): to gain a "tactical advantage over another
lawyer, to punish or inconvenience another for a personal or professional slight, or to harass
another lawyer."  In re Linerboard Antitrust Litig., 2008 WL 2758442, at *16 (quoting Pa. R.
Prof. Conduct 8.3(a) cmt. 4).

dated October 3, 2008.  In re Linerboard Antitrust Litig., 2008 WL 4461914, at *5 ("On

September 8, 2008, Langer discovered, from examining the docket for the Delaware County

Court action, that Peoples had filed a Complaint in the same court on December 31, 2007.").

The Complaint in the second state case alleged that Peoples "was entitled to ten percent of the

Box Class counsel fee awarded in Linerboard."  Id. at *2.  The Court found that the December

31, 2007, Complaint was part of Peoples's "state-court litigation strategy" to religate the

Linerboard fee dispute and that  this strategy "directly implicate[d]" the attorney's fees allocation

in Linerboard.  Id. at *5, 8–9.

        The Court makes explicit now what was unsaid in the October 3, 2008, Memorandum:

Peoples violated the All Writs Act Injunction when he filed the Complaint in the second state

case.  The Complaint in the second state case was based on the theory that Langer

"misrepresented the amount of the fee received . . . for the box subclass" and that Peoples

received approximately $2 million less than was required under his "contract" with Langer.

(Civil Case Docket No. 07-18531 and Complaint, Langer Ex. 19, ¶ 96.)  The Complaint

expressly acknowledged that it was an attempt to upset the allocation of fees in Linerboard.  (See

id. ¶¶ 112–27 ("The District Court does not have subject matter jurisdiction over the Peoples v.

Langer lawsuit.  . . .  The District Court is seemingly holding the case in limbo. . . . There is

multiple millions of dollars at stake and nothing is being held in escrow to protect those

funds.").)

        Therefore, the Court concludes that the filing of the Complaint in the second state case on

December 31, 2007, was "further action relating to the allocation of fees in MDL 1261"

proscribed by the All Writs Act Injunction.

### 4.     Contempt Four: Filing of Third State Case on January 9, 2008

The fourth alleged contempt is the filing of the third state case, Delaware County Court of Common Pleas Civil Action No. 08-1322, through praecipe for writ of summons on January 9, 2008.  Peoples's goal in filing the third state case was the same as that in filing the second state case: to recover approximately two million dollars from Langer on the theory that "Peoples . . . entered into a[n] oral contract . . . in which Langer promised Peoples 10% of the fees . . . expected to be awarded from settlement of the claims . . . in [Linerboard]."  (Interrogatories in Civil Action No. 08-1322, Langer Ex. 13, at 2.[27])  The filing of the third state case was also one of the reasons the Court reinstated the All Writs Act Injunction on October 3, 2008.  In re Linerboard Antitrust Litig., 2008 WL 4461914, at *8–9.

As with the second state case, the Court's October 3, 2008, Memorandum effectively found that Peoples violated the All Writs Act Injunction by filing the third state case.  See id. at *4 (concluding that the "statements and discovery requests in [the third state case] demonstrate that what this Court considered to be a personal dispute between Peoples and Langer is far more than that—it is an attempt by Peoples, directly or indirectly, to force a reallocation of the fees received by the numerous attorneys who represented the Box Class members in Linerboard").  The Court formalizes that conclusion now: the third state case, Delaware County Court of Common Pleas Civil Action No. 08-1322, was "further action relating to the allocation of fees in MDL 1261."  Accordingly, Peoples violated the All Writs Act Injunction when he instituted the third state case on January 9, 2008.

---

[27] As discussed supra, Stephen Palmer, Esquire, served the interrogatories while the All Writs Act Injunction was vacated, and Langer admitted that Palmer's conduct was proper. (2/29/12 Tr. 10–11.)

5.      **Contempts Five through Seven: Service of Subpoenas on Republic First Bank on June 2, 2009; June 15, 2009; and September14, 2009**

i.      **Violation of the All Writs Act Injunction**

Langer next argues that Peoples violated the All Writs Act Injunction when, as part of the third state case, he served three subpoenas on Republic First Bank ("RFB") in an attempt to gain the transaction records of the <u>Linerboard</u> account.  The Court agrees and concludes that Peoples violated the All Writs Act Injunction each time he served a subpoena on RFB.  The Court further concludes that the subpoenas were served in violation of the Pennsylvania Rules of Civil Procedure.

On June 2, 2009, Peoples sent a subpoena and cover letter to RFB, captioned with Delaware County Court of Common Pleas Civil Action No. 08-1322, that purported to require RFB to produce "[a]ll records of all transactions, deposits, withdrawals, transfers, debits, credits, checks, etc. for Account of 'Linerboard Antitrust litigation' . . . set up by Howard Langer, Esq. or another, from 1/1/03-12/31/08."  (June 2, 2009, Letter and Subpoena from John F. Peoples.)  On June 15, 2009, Peoples sent an additional cover letter and subpoena, again referencing the third state case, to "withdraw[]" the first subpoena and request "[a]ll records of all transactions, deposits, withdrawals, transfers, checks, debits, credits, etc. for account of Linerboard Litigation Fund for period 1-1-03 to 12-31-08."  (June 15, 2009, Letter and Subpoena from John F. Peoples, at 1–2.)  After RFB produced some responsive documents, and after the exchange of additional correspondence, Peoples served a third subpoena on September 14, 2009, requiring RFB to produce the documents related to certain accounts that the subpoena identified by number only.  (Sept. 14, 2009, Letter and Subpoena from John F. Peoples to RFB.)

59

The scope of the subpoenas themselves establish that Peoples served them to effectuate the purpose behind the third state case.  Peoples sought to obtain the financial records of the Linerboard accounts with the goal of showing that "Langer and the other attorneys in the Box Sub-Class received approximately $49 million dollars," and that "Langer fraudulently misrepresented both to [then-Chief Magistrate Judge] Reuter [sic.] and to Peoples . . . that the group had received $29,400,000.00."  (Interrogatories in Civil Action No. 08-1322, at 2–3.)  The correspondence Peoples sent RFB confirms his goals beyond all doubt: by serving these subpoenas, Peoples was "hoping to find . . . who was paid from the Linerboard settlement[, and] . . [h]ow much was received in the settlement."  (E.g., September 30, 2009, Letter from John F. Peoples, Esquire, to RFB, at 1.)  Because the subpoenas were part of Peoples's efforts to upset the allocation of attorneys' fees in Linerboard, each was a separate violation of the All Writs Act Injunction, which the Court had reinstated on October 3, 2008.

### ii.    The Subpoenas Were Served in Violation of Pennsylvania Rules of Civil Procedure

As discussed supra, neither Langer nor the Court was aware of Peoples's attempts to obtain the Linerboard account information from RFB until RFB produced its records to Langer during the 2012 TRO proceedings.  Peoples failed to notify Langer of the service of the subpoenas as required by Pennsylvania Rule of Civil Procedure 4009.21(a).  (Langer Cross-Motion 9.)  The state court docket shows that no certificate of service of notice was ever filed. (Civil Case Docket No. 08-1322 at 1.)

The first two subpoenas, served in June 2009, purported to be subpoenas duces tecum in connection with depositions, while the third subpoena is merely a subpoena duces tecum.

Pennsylvania Rule of Civil Procedure 4009.21 applies to the latter, and Rule 234.1 applies to the former.  Rule 4009.21(a) provides that "[a] party seeking production from a person not a party to the action <u>shall give written notice to every other party</u> of the intent to serve a subpoena at least twenty days before the date of service.  A copy of the subpoena proposed to be served shall be attached to the notice."[28]  (Emphasis added.)  The non-subpoenaing party may raise an objection to the subpoena, and, if such an objection is raised, "the subpoena shall not be served" until a court resolves the objection.  Pa. R. Civ. Proc. 4009.21(c)–(d).  Rule 234.1 does not contain a comparable provision, but the notes and commentary establish that a litigant may not "circumvent[] the notice provision of Rule 4009.21 by means of a subpoena <u>duces tecum</u> issued in connection with a deposition."  Pa. R. Civ. Proc. 234.1, 1998 Explanatory Cmt.  This is because Rule 4007.1(a) requires "reasonable notice in writing to every party" of a deposition and Rule 4007.1(d)(2) forbids a non-party from producing subpoenaed documents prior to a deposition "except upon the consent of all parties."  Pa. R. Civ. Proc. 234.1(a) Note ("The twenty-day notice requirement of Rule 4009.21(a) is not applicable to a subpoena issued under Rule 234.1 in connection with a deposition. . . . Rule 4007.1(d)(2) . . . serves the same purpose as the notice requirement under Rule 4009.21(a).").

Because Peoples never gave Langer notice of the three non-party subpoenas, he violated the Pennsylvania Rules of Civil Procedure in addition to the All Writs Act Injunction.  This Court is not the appropriate forum to determine whether Peoples's actions constituted a federal or

---

[28] The Pennsylvania rules also provide that a "party seeking production may serve on the person named in the subpoena a copy of the subpoena only . . . if the party seeking production has filed of record a certificate that the notice of intent to serve a subpoena was mailed or delivered to each party at least twenty days prior to the date on which the subpoena is sought to be served . . . ."  Pa. R. Civ. Proc. 4009.22(a)(1).  The docket entries show that Peoples never filed any such certificate.  (<u>See</u> Civil Case Docket No. 08-1322 at 1.)

state crime, as Langer argues.  (Langer Cross-Motion 10–13.)  However, the far-reaching effects

of Peoples's surreptitious method of obtaining the RFB financial records deserve emphasis.

Because Langer never received notice of the subpoenas to RFB, he was unable to object to RFB

producing the records of the <u>Linerboard</u> account to Peoples.  Moreover, because the subpoenas

Peoples served were so broad in scope, Peoples obtained far more than just the allocation of

counsel fees in <u>Linerboard</u>; he also received financial records pertaining to individuals and

accounts who bore no relation to the Peoples–Langer dispute.  Peoples's abuse of the subpoena

process—in a case that this Court had enjoined—may constitute a violation of federal or state

criminal statutes.  The Court will provide a copy of this Memorandum and Order to the office of

the United States Attorney for this District so that it may take any action it deems appropriate,

including, <u>inter alia</u>, reference to state investigative authorities.

### 6.    Contempt Eight: Communications with IRS Between February and October 2010

Langer contends that Peoples violated the All Writs Act Injunction between February and

October 2010 by contacting the IRS, claiming to be a whistleblower, and alleging that Langer

underreported his income in relation to the <u>Linerboard</u> settlement.

Peoples filed a completed IRS Form 211, an "Application for Award for Original

Information," dated March 8, 2010, in which he repeated the same claim he pursued

unsuccessfully in many other fora: that "Langer received 29.6 million dollars from [the

<u>Linerboard</u>] settlement" but later claimed "that he received between 9 and 12 million dollars."

(Completed IRS Form 211, Langer Ex. 46, at IRS267-68.)  Based on those fallacious statements,

Peoples reported to the IRS that Langer "ha[d] not fully reported the amounts received" in

income in 2004 and 2005.  (Id.)  He "attached copies of the [Linerboard] treasury and disbursement accounts as support."  (Id.)  Peoples continued to corresponded with the IRS throughout 2010, reasserting several times his claims that he had not received his fair share of the counsel fees in Linerboard.

Peoples's instigation of the IRS audit was enjoined by the All Writs Act Injunction, which prohibited Peoples from "taking any further action relating to the allocation of fees in MDL 1261, or the action of liaison counsel in connection therewith, in any court or forum other than the United States District Court for the Eastern District of Pennsylvania."  (Emphasis added.)  Contacting the IRS with the hope that it would uncover concealed funds from the Linerboard settlement served two purposes for Peoples:  it was both an attempt to harass Langer and an effort to establish that the additional funds existed so that Peoples could claim a portion of them.  This conduct was a violation of the All Writs Act Injunction, as Peoples himself acknowledged in writing to the IRS that: "It took the author 5 ½ years to obtain bank account information and I did so at the risk that Judge DuBois would find out and hold me in contempt." (July 2, 2010, E-mail and Letter, Langer Ex. 31, at 5.)

Two other points regarding the IRS audit are particularly deserving of mention.  First, as with the subpoenas discussed supra, Langer asks the Court to determine that Peoples committed criminal acts in his correspondence with the IRS—specifically, making false statements in violation of 18 U.S.C. § 1001.  This is not the appropriate forum for such a determination. However, the Court notes that many of the statements Peoples made, both in IRS Form 211[29] and in other correspondence, were entirely devoid of any factual support.  A number of these

---

[29] A claimant who signs IRS Form 211 declares that its contents are "true, correct, and complete, to the best of [his] knowledge."

statements—whether about the Linerboard fee allocation, the allegations of an improper relationship between the Court and Langer, or Peoples's unsupported statement that this Court had no jurisdiction over him—were in direct contradiction of the Third Circuit's opinion, which was issued months earlier.  For example, the claim that "Langer had unprecedented influence with Judge DuBois," which Peoples made by letter to the IRS dated July 1, 2010, had been rejected by the Third Circuit as "spurious" and "unsupported."  In re Linerboard Antitrust Litig., 361 F. App'x at 400–01.

Second, although the need for confidentiality in whistleblower proceedings is a paramount concern, the Court observes that the IRS pursued Peoples's complaint to the point of conducting an audit of Langer and his wife.  This occurred even though the IRS was in possession of documents that should have raised red flags as to whether Peoples's conduct was in violation of a court order or whether he had obtained the Linerboard bank records by legal means, much less whether his allegations had any legitimate basis.  Apart from the suspicions that should have arisen merely from Peoples having included "copies of the [Linerboard] treasury accounts and disbursement accounts," Peoples also stated that he had risked contempt to obtain the Linerboard account records, and he included the first page of the letter dated October 7, 2008, from Stephen Palmer, referencing the All Writs Act Injunction.  Peoples's instigation of the IRS audit, like the rest of his efforts to unsettle the Linerboard counsel fee allocation, caused many parties to expend unnecessary time and effort, and it is regrettable that the audit process extended as far as it did before Langer was exonerated and Peoples's misconduct came to light.

64

E.       **Conclusion**

Langer has met his burden of showing by clear and convincing evidence that Peoples had

knowledge of three valid court orders and committed eight separate violations thereof.  Peoples

has offered no defense to any of the instances of contempt.  Accordingly, the Court concludes

that Peoples committed contempt by engaging in each of the eight acts enumerated above.  See

Lane Labs-USA, Inc., 624 F.3d at 582.

**V.       REMEDIES**

A.       **Standard—Remedies for Civil Contempt**

"[T]he touchstone of civil contempt is that it be coercive or compensatory."  Inst. for

Motivational Living, Inc. v. Doulos Inst. for Strategic Consulting, Inc., 110 F. App'x 283, 289

(3d Cir. 2004).  "A district court has 'wide discretion in fashioning a remedy' for civil

contempt."  Int'l Mktg., 48. App'x at 374 (citing Council for Clean Air v. Pennsylvania, 678 F.2d

470, 478 (3d Cir. 1982)).  "[P]enalties for civil contempt are limited to measures that may be

appropriate to compel compliance with the underlying order and to compensate the opposing

party for losses sustained as a result of the noncompliance."  Wedgewood Village Pharmacy, Inc.

v. United States, 421 F.3d 263, 268 (3d Cir. 2005) (citing United States v. United Mine Workers,

330 U.S. 258, 303–04 (1947)).  Although it is not a defense, willfulness is "relevant to the

contempt proceeding . . . insofar as it pertain[s] to the extent of the sanction to be imposed."

Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148–149 (3d Cir. 1994) (citing TWM Mfg. Co. v.

Dura Corp., 722 F.2d 1261, 1273 (6th Cir. 1983)).

The Court reaffirms its continuing jurisdiction before addressing the various forms of

relief that Langer requests.

### B.    Court's Continuing Jurisdiction

The Court will have jurisdiction to enforce the Order issued concurrently with this

Memorandum.  This issuance of this Order and the relief ordered therein are necessary to

"protect the integrity" of the <u>Linerboard</u> settlement, over which the Court retained jurisdiction in

its June 4, 2004, Order, along with jurisdiction over "all issues relating to the fees and costs of

counsel in this action."  <u>See</u> <u>In re Linerboard Antitrust Litig.</u>, 361 F. App'x at 399 ("The District

Court's authority to enforce the All Writs Injunction and the Consent Injunction continued even

after the <u>Linerboard</u> class action terminated.");  <u>In re Prudential</u>, 261 F.3d at 367–68.

Furthermore, the fact that the parties who are subject to the injunctive relief discussed <u>infra</u> were

not parties to the <u>Linerboard</u> case does not prevent the Court from ordering such relief because

"the District Court's authority to enforce its injunction extends over non-parties," <u>In re</u>

<u>Linerboard Antitrust Litig.</u>, 361 F. App'x at 396, when, as is the case here, those non-parties are

"'in a position to frustrate the implementation of a court order or the proper administration of

justice,'" <u>Porter</u>, 659 F.2d at 325 (quoting <u>United States v. N.Y. Telephone Co.</u>, 434 U.S. 159

(1977)).

### C.    Permanent Injunction Regarding Financial Information

Langer seeks a permanent injunction to protect the confidential information Peoples

obtained from RFB regarding the <u>Linerboard</u> account and, in particular, to protect any of that

information that would reveal the confidential counsel fee distribution.  He argues that the Court

should enjoin Peoples, Marcone, Pompilii, Cristal, Rosenbaum, and any other person with notice

of the injunction "from disclosing, publishing, copying or disseminating in any fashion any

information that reveals the amounts of any distribution received by any law firm in <u>In re</u>

66

Linerboard Antitrust Litigation or any other information obtained from the files of Republic First

Bank relating to In re Linerboard Antitrust Litigation or any other confidential information

contained in said files."

Through Rosenbaum, Peoples stipulated to entry of this permanent injunction.  (See

2/28/12 Tr. 4–5 ("[W]e're prepared to stipulate not only to the preliminary injunction that you

entered, but to a permanent injunction, based upon the documents that have been produced and

based upon what we anticipate the testimony is going to be.").)

Accordingly, the Court will enter the permanent injunction requested by Langer and

agreed to by Peoples.

### D.    Coercive Sanctions

According to Langer, Peoples's track record of noncompliance with this Court's Orders

merits coercive monetary sanctions against Peoples, to be imposed if Peoples again violates the

All Writs Act Injunction or if he violates the injunctions set forth in the Order accompanying this

Memorandum.  Rosenbaum stated that a coercive fine "would be an incentive for Mr. Peoples

not to violate [court orders]," but he disagreed with Langer as to the amount of such a fine.

(2/29/12 Tr. 56.)

Among a court's firmly established inherent powers is the ability to fine a contemnor.

United States v. Hudson, 11 U.S. 32, 34 (1812).  In exercising that power, courts distinguish

between punitive fines for criminal contempt that "vindicate the authority of the court" and

coercive fines for civil contempt that are "designed to benefit a party that has complained to the

court about the contemnor's recalcitrance."  In re Grand Jury Investigation, 600 F.2d 420,

422–23 (3d Cir. 1979).  A fine to be imposed only in the event of a future breach of a court order

is a permissible sanction for civil contempt as long as "the purpose [of the fine] is to make the defendant comply." Mine Workers, 330 U.S. at 303–04 (citing Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 443 (1911)); cf. United States v. Harris, 582 F.3d 512, 515 (3d Cir. 2009) ("With civil contempt, the contemnor will be released subject to compliance with some condition."). In exercising its discretion to impose such a fine, the Court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." Mine Workers, 330 U.S. at 304; see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 830 (1994) ("Lower federal courts and state courts . . . have relied on Mine Workers to authorize a relatively unlimited judicial power to impose noncompensatory civil contempt fines."). To set the amount of the fine, the Court must take into account the potential severity of the fine in the context of the contemnor's financial resources. Mine Workers, 330 U.S. at 304.

A coercive monetary fine, to be imposed only if Peoples fails to comply with this Court's orders, is necessary to protect Langer and the finality of the class-action settlement and counsel fee allocation in Linerboard. Since 2004, Peoples has tirelessly sought to vindicate his chimerical claim, disrupting Langer's life and wasting the time and money of the ever-growing cast of participants in this case. He has remained noncompliant even though the Court declined to impose sanctions despite finding two violations of its orders in 2008 and even though the Third Circuit's unequivocally rejected all of his claims. Accordingly, a stronger incentive for Peoples to comply with the Court's Orders is required.

The Court must next determine the amount of the monetary fine to be imposed in the event of each future violation. LaRocca asserted that $100,000 would be appropriate. (2/29/12

68

Tr. 36.)  Rosenbaum argued that $100,000 was "huge" in light of Peoples's "fairly meager lifestyle" and medical conditions.[30]  (Id. at 56.)  After consideration of the factors in Mine Workers, and bearing in mind the medical difficulties Peoples faces, the Court concludes that a fine in the amount of $25,000 for each violation, to be imposed if the Court finds that Peoples has violated one of its orders, will adequately deter any future contempt.

### E.        Production of All Republic First Bank Documents

The subpoenas Peoples served on RFB in violation of the All Writs Act Injunction resulted in confidential financial information, including the counsel fee allocations in Linerboard, being disseminated in hard copy and in electronic format to a number of individuals in various locations.  Troublingly, even Pompilii, who handled most of Peoples's business affairs, was confused about the exact whereabouts of all of the purloined documents, as was repeatedly demonstrated by her testimony regarding both electronic copies, (see, e.g., 2/28/12 Tr. 101–02 ("I'm just trying to think if I have sent [the spreadsheets prepared from the RFB documents] to anyone, and I couldn't off the top of my head say yes, I did or did not.")), and hard copies, (see, e.g., id. at 121 ("When we closed the office, I don't know if there's maybe another file . . . there may be another filing, another box in the [shed] that I didn't see.")).  Apart from the physical copies located in Peoples's house or in his storage shed, the evidence at the hearing also disclosed the following possible locations for the documents: in the possession of Frank Marcone; on Pompilii's computer, which had originally been in Peoples's office when it was open; on Cristal's computer or other computers connected to the network that had been in Peoples's law office; on the computers of Rosenbaum and his law firm; and on the computers of

---

[30] The transcript reads "$9,000," (2/29/12 Tr. 56), but it is apparent from a reading of the transcript that Rosenbaum meant "$100,000."

Timby and Gibson & Perkins.  The need for a comprehensive approach to remedying the disclosure of this information is further supported by the fact that the number of documents in the possession of different entities in February 2012 varied considerably.  (See Comparison of RFB Records, Langer Ex. 35 (noting that RFB produced 259 pages, Peoples produced 151 pages, and Gibson & Perkins produced 824 pages).

Langer asks the Court to take measures to ensure the return of all originals and copies of the confidential information obtained from RFB, whether in electronic or paper form. Rosenbaum stated on Peoples's behalf that Peoples did not "have a problem with the production of originals and copies."  (2/29/12 Tr. 57.)  The parties further agreed that Rosenbaum and Timby would be able to file a certification of compliance on behalf of themselves and their law firms, confirming that they had returned or deleted all of the copies in their possession.  Langer also asked that the Court appoint the firm of IT Acceleration to review the computers of Peoples, Pompilii, Cristal, and Marcone, and any other person identified as having possessed a digital copy of the RFB records—excepting Rosenbaum and Timby—to ensure that the RFB records are permanently erased from those systems.  Rosenbaum did not address the specific issue of whether Peoples agreed to appointment of IT Acceleration.

A document-clawback order is appropriate to rectify Peoples's service of the subpoenas on RFB and subsequent dissemination of the RFB financial records he obtained in violation of the All Writs Act Injunction.  Such an order will serve the remedial purpose of a civil contempt sanction.  See Bagwell, 512 U.S. at 831.  Accordingly, the Court will require Peoples, Pompilii, and Cristal, through Rosenbaum, to produce (a) the original and copies of all of the paper documents received from or containing information received from RFB and (b) all of the digital

material scanned, copied, or produced from such information.  Rosenbaum and Timby shall

certify that persons with appropriate expertise have searched their firms' paper and electronic

files and that any and all information obtained from the files produced by Republic First Bank in

this matter has been permanently deleted.  Rosenbaum shall also file a certification setting forth

any further actions, not previously disclosed, that were taken by, or on behalf of, John Peoples

against Howard Langer or any firm by which he has been employed since 2004.

The Court will appoint IT Acceleration as an independent computer forensics expert at

Peoples's expense to ensure that all electronic copies of the RFB documents are deleted.  At least

one court has approved a similar procedure in a case involving a stolen proprietary customer list

when there was evidence that, contrary to defendants' assertions, the customer list was retained

on defendants' computers in electronic form:

> [Defendants shall] make available for immediate forensic examination all computers they possess or have used in connection with [the allegedly stolen material] and to allow [plaintiff] to access defendants' electronic database on any such computer. This forensic examination shall include a determination as to whether information pertaining to those active, inactive or prospective customers whose names [defendants] entered into the [plaintiff's] database is or was stored on such computers and, if deleted, when the material was deleted. This Court holds that questions of confidentiality can be resolved by appropriate protective orders and/or by the retention of outside experts to report to the Court and counsel under appropriate instructions.

See Am. Family Mut. Ins. Co. v. Roth, Nos. 05-C-3839 & 05-C-3867, 2008 WL 1683693, at *5

(N.D. Ill. Jan. 15, 2008).[31]

_____

[31] Langer also refers the Court to a similar order in Bell v. Lockheed Martin Corp., Civ. no. 08-cv-6292 (D.N.J. Jan. 12, 2012) (order adopting report and recommendation of magistrate judge).

The procedure Langer requests is also very similar to computer searches authorized in discovery disputes. In those cases, appointment of a computer expert to examine a non-party's computers arises in an analogous context: one party contends that the opposing party's computers contain responsive documents that have not been produced during discovery.  E.g., Bank of Mongolia v. M & P Fin. Servs., Inc., 258 F.R.D. 514, 520–22 (S.D. Fla. 2009).  In such cases, computer experts use search terms to determine if a computer system contains responsive documents.  Id. at 521.  The testimony of David Yarnall, CEO of IT Acceleration, confirmed that IT Acceleration would follow a comparable procedure.  (See 2/28/12 Tr. 36 ("[W]e could actually just run those file names as searches and only produce those file names.").)

Accordingly, the Court concludes that appointing IT Acceleration at Peoples's expense is appropriate to remedy the disclosure of the confidential banking information.  The parties shall use the following procedure:

> (1)  Rosenbaum shall identify every computer or other digital media, and its present location, that contains or once contained, any digital information obtained from the files produced by Republic First Bank, including all computers of Mr. Peoples, his former counsel, Frank Marcone, Sharon Pompilii, Steven Cristal, or any other person—save Richard Rosenbaum, Walter Timby, and their respective law firms—known to have had access to such material.
>
> (2) The parties shall confer in an effort to agree upon the procedure by which IT Acceleration shall review the computer systems of John Peoples, Sharon Pompilii, Stephen Cristal, Frank Marcone, and any other computer identified in response to paragraph (1) above to assure that no information obtained from the files of Republic First Bank remains on those systems.  The parties shall jointly report to the Court within three weeks as to whether they have reached an agreement on a procedure that protects both the confidentiality of the RFB bank records and the fidelity of the individuals' computer systems and personal files.

If the parties are unable to agree, the Court will issue an order establishing an appropriate procedure.

### F.    Reinstatement of 2005 Emergency TRO and 2005 Consent Stipulation Order

Langer asks the Court to reinstate the 2005 Emergency TRO and 2005 Consent Stipulation Order on a permanent basis to enjoin Peoples from "having any contact or other communication, or leaving any messages for Liaison counsel, Howard Langer; and, [f]rom undertaking any other action of any kind, directly or indirectly, having the intended or the necessary effect of harming Howard Langer or his family in any fashion."

Because Rosenbaum consented on Peoples's behalf, (2/29/12 Tr. 58), the Court will reinstate the 2005 Emergency TRO and 2005 Consent Stipulation Order as permanent orders.

### G.    Fees and Costs Related to Contempts

Langer asks that the Court require Peoples to pay the fees and costs incurred in litigating the contempt motions since 2006, as set forth in Langer Exhibits 39 through 43.  Rosenbaum acknowledged that LaRocca and Langer are "entitled to some fees and costs," (2/29/12 Tr. 58), but argued that attorneys' fees may not be imposed due to a rule against fee-shifting in contingency-fee cases, relying on City of Burlington v. Dague, 505 U.S. 557 (1992).  (Id. at 58–59.)

Attorneys' fees may be imposed as a civil contempt sanction to compensate the aggrieved party.  Bagwell, 512 U.S. at 831, quoted in United States v. Criden, 633 F.2d 346, 352 (3d Cir. 1980); see also Hutto v. Finney, 437 U.S. 678, 691 (1978) ("Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance.").  "[T]he innocent party is entitled to be made whole for the

73

losses it incurs as the result of the contemnors' violations, including reasonable attorneys' fees

and expenses."  <u>Halderman v. Pennhurst State School & Hosp.</u>, 49 F.3d 939, 941 (3d Cir. 1995).

Any amount awarded "must . . . be based upon evidence of complainant's actual loss."  <u>Mine</u>

<u>Workers</u>, 330 U.S. at 304.

The Third Circuit's opinion in <u>Rode v. Dellarciprete</u>, 892 F.2d 1177, 1183 (3d Cir. 1990),

guides the determination of reasonable attorneys' fees:

> The party seeking attorney's fees has the burden to prove that its
> request for attorney's fees is reasonable. To meet its burden, the fee
> petitioner must submit evidence supporting the hours worked and
> rates claimed. In a statutory fee case, the party opposing the fee award
> then has the burden to challenge, by affidavit or brief with sufficient
> specificity to give fee applicants notice, the reasonableness of the
> requested fee. The district court cannot decrease a fee award based on
> factors not raised at all by the adverse party. Once the adverse party
> raises objections to the fee request, the district court has a great deal
> of discretion to adjust the fee award in light of those objections. . . .
> The most useful starting point for determining the amount of a
> reasonable fee is the number of hours reasonably expended on the
> litigations multiplied by a reasonable hourly rate.

The Third Circuit expressly instructed this Court to consider on remand Langer's requests

for attorneys' fees, and the Court now grants Langer's requests.[32]  The fees and costs Langer

seeks are reasonable to compensate him for several reasons.  First, Langer asks only for

attorneys' fees for LaRocca and LaRocca's firm, not for himself, and the amounts requested

represent a mere fraction of the time actually invested in this case over almost six years.

Specifically, Langer requests compensation for LaRocca that represents 326 hours at a net hourly

---

[32] Peoples's argument that the Court is constrained from awarding attorneys' fees under <u>Dague</u> is rejected.  Rosenbaum's admission that <u>Dague</u> is "not on all fours," (2/29/12 Tr. 59), is an understatement.  <u>Dague</u>—holding that lodestar amounts without contingency enhancements are the proper measure of attorneys' fees to be awarded prevailing parties under the Solid Waste Disposal Act and Clean Water Act, <u>see</u> 505 U.S. at 559, 566–67—is clearly inapposite.

rate of $533, for a total of $173,578.  (Supp. Decl. Robert J. LaRocca, Langer Ex. 42, ¶ 2.)

Langer submitted documentation showing that the amount of hours has been written down to

request only 55% of the time LaRocca personally worked on this matter.[33]  Second, Langer

provided extensive evidence in support of the fees and costs incurred in litigating the various

contempt motions.[34]  (See Langer Exs. 39–45.)  Third, the documentary evidence as to the fees

Langer seeks was further supported by the declaration and testimony of attorney H. Laddie

Montague, Junior, Esquire, who opined as to the reasonableness of LaRocca's hourly rate.

Accordingly, the Court concludes that Langer's request for attorneys' fees complies with

the Third Circuit's formula of "the number of hours reasonably expended . . . multiplied by a

reasonable hourly rate."  Rode, 892 F.2d at 1183.  The Court awards Langer fees and costs as

follows: $173,758 in attorneys' fees for tasks performed by LaRocca; $11,343.78, incurred by

LaRocca's firm in fees and costs; and $5,575.00 paid by Langer to the Heffler Radetich firm for

accounting services in responding to the IRS audit that Peoples instigated.

The Court thus concludes that Langer is entitled to $190,676.78 in fees and costs incurred

in litigating the contempt motions.

### H.    Fees and Costs Related to 2012 TRO

Langer also requests an award of $59,020 in attorneys' fees incurred in responding to the

Notice of Service of Peoples's Motion for Relief, including seeking the 2012 TRO.  Specifically,

he asks for $37,770 in attorneys' fees that he and his law firm incurred and for $21,250 in

---

[33] If all of LaRocca's hours and those of other partners, associates, and paralegals in his firm were included, the attorneys' fees would be $330,842.  (LaRocca Supp. Decl. 2.)

[34] Among those costs is $1730.80 taxed by the Third Circuit on appeal.  (Order of January 14, 2010, Taxing Costs Against Appellee/Cross-Appellant John F. Peoples, Langer Ex. 40-6.)

attorneys' fees incurred by LaRocca and his law firm.  (Decl. Howard Langer, Cross-Motion for Sanctions Ex. A, ¶ 5; Decl. Robert LaRocca, Cross-Motion for Sanctions Ex. B, at ¶ 11.)

Langer argued in his Cross-Motion that Rosenbaum and his firm should bear these costs, but the Court already ruled that Peoples was responsible for the confidential banking information that was included in the Notice of Service of Peoples's Motion for Relief. (2/29/12 Tr. 64.)  The costs that Langer incurred are in litigating the 2012 TRO are like the costs incurred in litigating the contempt motions: they are losses incurred as the result of Peoples's repeated violations of court orders, and it was by filing the 2012 TRO that Langer brought the illegal subpoenas and IRS issues to light.  "[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party . . . ."  Cook v. Ochsner Found. Hosp., 559 F.2d 270, 272 (5th Cir. 1977), quoted in Robin Woods, 28 F.3d at 400; see also Halderman, 49 F.3d at 941.

Based on the documentation set forth in the declarations attached to the Cross-Motion, as well as the evidence discussed supra regarding fees and costs incurred in litigating the contempt motions, the Court concludes that the attorneys' fees Langer seeks as to the 2012 TRO are reasonable.  See Rode, 892 F.2d at 1183.  Langer has provided documentation as to the work he and LaRocca undertook in litigating the 2012 TRO and as to their qualifications.  Moreover, as with the fees and costs regarding the contempt motions, both attorneys have not requested all of the time they actually spent working on the 2012 TRO.  (2/28/12 Tr. 156 (Langer's statement that he and LaRocca do not, for example, seek reimbursement for the time spent at the Preliminary Injunction Hearings and have only recorded a "fraction" of their time).)

In Robin Woods, the Third Circuit held: "Only with an award of attorneys' fees can [plaintiff] be restored to the position it would have occupied had [civil contemnors] complied

76

with the district court's injunction."  28 F.3d at 400.  Similarly, in this case, an award of fees and

costs incurred in litigating the 2012 TRO is necessary to restore Langer to the position he would

have been in had Peoples complied with the All Writs Act Injunction and never obtained the RFB

records.  The Court thus grants Langer's request for $59,020 in attorneys' fees incurred in

responding to the Notice of Service of Peoples's Motion for Relief, including seeking the 2012

TRO.

### I.       Frank Marcone

The Court next addresses Langer's request that the Court take disciplinary action against

Frank Marcone for what Langer contends was unauthorized practice of law.  Following the

February 29, 2012, hearing, the Court received submissions from both Marcone and Langer as to

the instances in which Marcone allegedly violated the order suspending him from the practice of

law in this District.

The Court has considered those submissions, as well as the evidence presented during the

civil contempt proceeding regarding Marcone's role in the Peoples–Langer dispute.  The concerns

raised by these allegations of unauthorized practice are best addressed by the judges who consider

Marcone's application for reinstatement to practice, should Marcone pursue reinstatement.

Accordingly, the Court will provide the Committee on Admissions with a copy of the materials

submitted by Marcone and Langer, as well as a copy of this Memorandum.

### J.       John Peoples

The final matter the Court must address is whether to recommend disciplinary action

against Peoples.  The Court concludes that his conduct in this case—as evidenced in this

Memorandum—warrants reference to the Disciplinary Board of the Supreme Court of

Pennsylvania.  Nevertheless, because of his ill health and the fact that he is no longer actively engaged in the practice of law, the Court does not deem it appropriate to do so on the present state of the record.  The Court will reconsider this determination in the event it learns that Peoples has resumed the practice of law or that he has committed any additional violations of the orders issued in this case.

## VI.    CONCLUSION

As the Court stated at the conclusion of the February 28, 2012, hearing:

> This case is a travesty.  It's taken on a life of its own. . . . The evidence of violations of court orders is dramatic. . . .
>
> I was really jarred when I read in the IRS documents that Peoples recognized that he was violating my order and would be held in contempt if I found out that he was going after the <u>Linerboard</u> bank records by subpoena. And that he issued a subpoena that was unlawful in an action that had been enjoined under the All Writs Act Injunction. That demonstrates the very worst of what lawyers are capable of doing, in my judgment.  And I'm just shocked.  I'm shocked at the things People said after I issued my opinion in 2008 and really gave him a pass on all of his misconduct . . . Only to have him turn around and continue to violate the All Writs Act Injunction, which was reinstated. . . .
>
> [T]his has not been a very pleasant chapter in the <u>Linerboard Antitrust Litigation</u>[, and] something has to be done about it.

(2/28/12 Tr. 173.)

As the Third Circuit observed, "Peoples's grievances against Langer have unnecessarily consumed judicial resources for too long."  361 F. App'x at 401.  It is the Court's sincere hope that this Memorandum and accompanying Order will put the Peoples–Langer dispute in the past. Accordingly, for the foregoing reasons, the Court finds that Peoples has committed civil contempt on eight separate instances and concludes that injunctive relief, coercive sanctions, and an award

of fees and costs is necessary to compensate Langer and to deter future violations of the Court's Orders.

An appropriate Order follows.